UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - x
                              :
UNITED STATES OF AMERICA,      :
                              :
          - v. -               :
                              :
ROGER MCFARLANE,               :
    a/k/a "Jamaican,"          :
    a/k/a "King Kong,"         :
JASON DIBARI,                  :        S1 11 Cr. 338 (DLC)
    a/k/a "Mutt,"              :
COREY DAIKER,                  :
    a/k/a "Skinny,"            :
RICHARD CUNNIUS, and           :
THOMAS GREEN, JR.,             :
    a/k/a "Remo,"              :
                              :
          Defendants.          :
                              :
- - - - - - - - - - - - - - - x


# MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS


PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Janis Echenberg/Rachel Kovner/Jonathan Cohen
Assistant United States Attorneys
-Of Counsel-

## **TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . .  1

ARGUMENT

    I.   THE MOTIONS FOR SEVERANCE SHOULD BE DENIED . . . .  3

        A. Background . . . . . . . . . . . . . . . . . . 3
        B. Applicable Law . . . . . . . . . . . . . . . . 8
        C. Joinder is Appropriate . . . . . . . . . . . 13
        D. The Severance Motions are Premature . . . . . 14
        E. The Defendants Have Not Carried Their Burden. . 15
        F. Severing Defendants Would Waste Judicial Resources
           and Create a Duplication of Efforts . . . . . . 23

    II.  JASON DIBARI'S MOTION TO SUPPRESS EVIDENCE SHOULD BE
       DENIED FOLLOWING AN EVIDENTIARY HEARING . . . . .  24

        A. Background . . . . . . . . . . . . . . . . . 25
        B. Legal Analysis . . . . . . . . . . . . . . . 30

    III. DAIKER'S MOTION TO SUPPRESS SHOULD BE DENIED . . . 43

        A. Background . . . . . . . . . . . . . . . . . 44
        B. Daiker Lacks Standing . . . . . . . . . . . . 48
        C. There is no Material Fact in Dispute . . . . . 53

    IV.  THE DEFENDANTS' MOTION FOR AN ORDER REQUIRING THE
       IMMEDIATE DISCLOSURE OF RULE 404(b) NOTICE SHOULD BE
       DENIED . . . . . . . . . . . . . . . . . . . . . 63

    V.   THE DEFENDANTS' MOTIONS FOR DISCLOSURE OF WITNESS'S
       IDENTITIES, PRIOR STATEMENTS, AND IMPEACHMENT
       MATERIAL SHOULD BE DENIED . . . . . . . . . . . 65

        A. Witness List. . . . . . . . . . . . . . . . . 65
        B. Identities of Witnesses . . . . . . . . . . . 68
        C. Prior Statements of Witnesses . . . . . . . . 70

    VI.  THE DEFENDANTS' MOTIONS ASKING THAT THE COURT COMPEL
       DISCOVERY OF BRADY MATERIAL AND THE PRESERVATION OF
       AGENTS' ROUGH NOTES SHOULD BE DENIED. . . . . . 73

VII.  THE COURT SHOULD DENY THE MOTIONS ASKING THAT THE
      COURT COMPEL THE GOVERNMENT TO PROVIDE NOTICE OF ITS
      INTENTION TO USE EVIDENCE AT TRIAL. . . . . . . . 75

VIII.    GREEN'S MOTION FOR AN ORDER REQUIRING DISCLOSURE
      OF ALL DOCUMENTS RELATED TO THE DENIAL OF A REQUEST
      FOR A SEARCH WARRANT FOR HIS RESIDENCE SHOULD BE
      DENIED  . . . . . . . . . . . . . . . . . . . . . 76

      A. Background  . . . . . . . . . . . . . . . . . . 76
      B. Discussion  . . . . . . . . . . . . . . . . . . 80

IX.   THE DEFENDANTS SHOULD BE REQUIRED TO SHOW GOOD CAUSE
      FOR FILING ANY ADDITIONAL MOTIONS . . . . . . . . 85

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 87

**INTRODUCTION**

The five defendants -- Roger McFarlane, a/k/a "King Kong," a/k/a "Jamaican," Jason DiBari, a/k/a "Mutt," Corey Daiker, a/k/a "Skinny," Richard Cunnius, and Thomas Green, Jr., a/k/a "Remo," -- have made various motions for pretrial relief. Specifically, their motions are as follows:

1. Severance:  Both Cunnius and Green move to sever their trials from each other, and from the other co-defendants.  DiBari and Daiker seek to join in these motions.

2. Suppression:  DiBari moves to suppress evidence obtained at the time of his arrest.  Daiker moves to suppress evidence from the stop of a truck registered in his name.

3. Disclosure:  DiBari and McFarlane both move for (i) notice of Rule 404(b) evidence; (ii) identification of confidential informants and cooperating witnesses, and disclosure of evidence impeaching them; (iii) production of personnel files of agents and evidence that impeaches them; (iv) an order compelling the preservation of rough notes and production of unredacted reports of law enforcement agents; and (v) disclosure of Brady material. Daiker

- 1 -

seeks to join these motions. Green also moves for
the preservation of law enforcement notes and
further moves for production of a witness list, and
Daiker seeks to join that motion.  DiBari and
McFarlane both move for an order to compel the
Government to provide notice of its intention to use
in its case in chief at trial any evidence which the
defendant may be entitled to discover under Federal
Rules of Criminal Procedure 16 and 12(b)(4). Daiker
seeks to join this motion as well.

4. <u>Disclosure of Search Warrant-Related Documents</u>:
Green moves to compel disclosure of documents
related to the denial of a search warrant for his
home.

The Government consents to a limited evidentiary
hearing concerning DiBari's motion to suppress.  With regard to
the remaining motions, the Government respectfully submits: (i)
that the motions for severance should be denied as premature or
alternatively as meritless; (ii) that Daiker's motion to
suppress should be denied without a hearing because he lacks
standing and because he has not put any material fact in
dispute; (iii) that the motion for immediate Rule 404(b) notice
should be denied as premature; (iv) that the disclosure motions

- 2 -

should be denied because they demand information before the law requires it and/or seek disclosures that are not disputed; (v) that Green's motion should be denied because the documents sought by Green are not subject to Rule 16 discovery; and (vi) that defense counsel should be required to show good cause before filing additional motions.

### ARGUMENT

### I.   THE MOTIONS FOR SEVERANCE SHOULD BE DENIED

Defendants Richard Cunnius and Thomas Green have filed motions for severance, seeking to be tried in a separate proceeding from co-defendants Roger McFarlane, Jason DiBari and Corey Daiker. Cunnius also seeks a separate trial from Green.  DiBari and Daiker seek to join in these motions.  For the reasons set forth below, the defendants' motions for severance are premature and therefore should be denied.  Moreover, the defendants' motions for severance are meritless.

### A.   Background

#### 1. Defendants' Roles In The Marijuana Organization

The Government expects the evidence at trial will show that the five defendants charged in Indictment S1 11 Cr. 338 (DLC) (the "Indictment") were all members of a large scale marijuana trafficking organization (the "Organization") involving dozens of individuals in California and New York, among other places, from at

least in or about 2008 until at least in or about 2010.  As part of the Organization's activities, thousands of pounds of marijuana, some of which was packaged in California and shipped to New York, was sold in and around New York City for millions of dollars in cash.

The five defendants in this case played important roles in the Organization.  McFarlane, among other things, transported large quantities of marijuana in and around New York for David Adams, who ran the distribution operation in New York City.[1] DiBari and Daiker, among other things, supplied large quantities of marijuana to Adams's associates in California, who in turn packaged and shipped the marijuana to New York, including to a warehouse rented by Cunnius.  There, Thomas Green, Jr., unloaded and repackaged the marijuana.  The Government expects evidence will show that, after the marijuana was sold in New York, members of the conspiracy would package large quantities of cash to be sent back to individuals including DiBari, a supplier whom members of the

---

[1]  Adams was charged in Indictment 10 Cr. 82 (TPG) and pleaded guilty to a narcotics conspiracy charge on December 15, 2010.  As part of his plea, Adams admitted to being a leader or organizer of the conspiracy.  Three other members of the Organization ("CC-1", "CC-2," and "CC-3") who were arrested on the same date have also pleaded guilty in 10 Cr. 82 (TPG). During the first half of 2010, through superseding instruments, an additional three defendants were charged in 10 Cr. 82 (TPG) with participating in the Organization's marijuana conspiracy. By March 2011, all of the defendants charged in 10 Cr. 82 (TPG) had resolved their cases through a plea.

organization understood to be coordinating shipments with Daiker
and others.

On December 2, 2009, law enforcement agents who had
conducted surveillance of McFarlane, Adams, CC-1, CC-2, and CC-
3, for nearly an entire day, arrested Adams, CC-1, CC-2, and
CC-3 in possession of approximately 145 kilograms of marijuana.
McFarlane, who had been observed meeting and switching vehicles
with individuals arrested on that date, had driven away in a
separate car shortly before the arrests.  The Government expects
that co-conspirator testimony will show that on December 2,
2009, Adams, CC-1, CC-2, CC-3, and McFarlane had been seeking to
recover a shipment of the Organization's marijuana that Adams
and others believed had been stolen by Cunnius and Green.
Adams, CC-1, CC-2, and CC-3 were arrested after the drugs were
recovered from those defendants.  Among the evidence
corroborating testimony concerning the activities on that date
will be notes recovered from Adams containing Cunnius's and
Green's home addresses, physical descriptions, and maps
recovered from CC-1 reflecting the location of Cunnius's and
Green's respective homes.

Shortly after the December 2, 2009 arrests, agents
conducted a search of Adams' apartment during which they seized,
among other things, drug ledgers referencing members of the

conspiracy including "Jam," a reference to McFarlane, and "Mutt," a reference to DiBari, as well as approximately $400,000 in U.S. currency, drug-related paraphernalia, and approximately 100 pounds of marijuana.

Following the arrests on December 2, 2009, Thomas Green, Jr., participated in threats to CC-1 regarding the treatment of Green and Cunnius in the marijuana conspiracy. Green traveled to CC-1's residence in or about March 2010 but was turned away without gaining entry.  Green subsequently met with another individual ("CC-4") in connection with CC-4 being hired to travel to CC-1's house with a threatening letter for CC-1.  When CC-4 went to CC-1's home in or around June 2010, CC-1 called the police, who ultimately arrested CC-4 and found on him, among other things, photographs of CC-1 and CC-1's wife and son, a hand-drawn floor plan of CC-1's house, a list of apparent grievances involving "R" (believed to be Richard Cunnius) and "T" (believed to be Thomas Green) related to drug activity, calculations of drug debts and a typewritten letter containing threats of violence.

After CC-4's arrest, CC-1 approached Cunnius to discuss the threats.  In a conversation on or about July 7, 2010 with CC-1 that was recorded by law enforcement, Cunnius discussed, sometimes in coded language, the marijuana business

- 6 -

they had been engaged in, the events of December 2, 2009, and
CC-4's visit to CC-1's house, with Cunnius indicating he had no
prior knowledge of the threats and would seek to intervene with
Green to end them.

### 2. Arrests of McFarlane, DiBari and Daiker

McFarlane was arrested in Virginia on April 11, 2011,
on a complaint charging him with participating in the same
narcotics conspiracy as had been charged in Indictment 10 Cr. 82
(TPG).  At the time of his arrest, McFarlane admitted, among
other things, to being present during events observed by law
enforcement leading up to the December 2, 2009 arrests.  On
April 13, 2011, a Grand Jury sitting in this district returned
an indictment against McFarlane charging him in one count with
conspiring to distribute and possess with intent to distribute
1,000 kilograms and more of mixtures and substances containing a
detectable amount of marijuana, in violation of Title 21, United
States Code, Section 846 and the case was assigned to Your
Honor.  DiBari and Daiker were charged with participating in a
narcotics conspiracy by complaint in May 2011, and Cunnius and
Green were charged by complaint in July 2011.[2]  All five

---

[2]     In his Memorandum in Support of Severance (Docket No. 85),
DiBari incorrectly states that Green and Cunnius were charged in
an earlier filed indictment. (DiBari Severance Memo. at 2.)  He
also is incorrect that the initial indictment in this case has

defendants were joined in the instant Indictment on or about
August 18, 2011.

**B. <u>Applicable Law</u>**

    **1.   Joinder Of Defendants Under Rule 8(b)**

       Rule 8(b) provides that an indictment may charge two or
more defendants "if they are alleged to have participated in the
same act or transaction, or in the same series of acts or
transactions, constituting an offense or offenses." Fed. R. Crim.
P. 8(b).  The Rule further provides that "[t]he defendants may be
charged in one or more counts together or separately." <u>Id.</u>

       The Second Circuit has interpreted the "same series of
acts or transactions" language of Rule 8(b) to mean that "joinder
is proper where two or more persons' criminal acts are 'unified by
some substantial identity of facts or participants,' or 'arise out
of a common plan or scheme.'" <u>United States</u> v. <u>Cervone</u>, 907 F.2d
332, 341 (2d Cir. 1990) (quoting <u>United States</u> v. <u>Attanasio</u>, 870
F.2d 809, 815 (2d Cir. 1989)).  The Second Circuit applies "a
'commonsense rule' to decide whether, in light of the factual
overlap among charges, joint proceedings would produce sufficient
efficiencies such that joinder is proper notwithstanding the
possibility of prejudice to either or both of the defendants
resulting from the joinder," <u>United States</u> v. <u>Rittweger</u>, 524 F.3d

---

been dismissed.  (<u>Id.</u>)

171, 177 (2d Cir. 2008) (quoting <u>United States</u> v. <u>Shellef</u>, 507 F.3d 82, 98 (2d Cir. 2007)), and whether joinder is warranted "must be determined on a case-by-case basis," <u>id.</u>  Finally, "[i]t is an 'established rule' that a 'non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed. R. Crim. P. 8(b),'" <u>United States</u> v. <u>Uccio</u>, 917 F.2d 80, 87 (2d Cir. 1990) (quoting <u>United States</u> v. <u>Nerlinger</u>, 862 F.2d 967, 973 (2d Cir. 1988)); <u>United States</u> v. <u>Friedman</u>, 854 F.2d 535, 561 (2d Cir. 1988) ("The mere allegation of a conspiracy presumptively satisfies Rule 8(b), since the allegation implies that the defendants named have engaged in the same series of acts or transactions constituting an offense.").

### 2.  Severance Under Rule 14

Rule 14 of the Federal Rules of Criminal Procedure permits severance of properly joined charges or defendants, at the discretion of the trial court, to avoid prejudice to a defendant or the Government.  Fed. R. Crim. P. 14.[3]  Under Rule 8, "[t]here is a

---

[3] Federal Rule of Criminal Procedure 14(a) provides, in pertinent part:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

preference . . . for joint trials of defendants who are indicted together." United States v. Salameh, 152 F.3d 88, 115 (2d Cir. 1998) (per curiam) (quoting Zafiro v. United States, 506 U.S. 534, 537 (1993)); United States v. Miller, 116 F.3d 641, 679 (2d Cir. 1997).

This preference is particularly strong where the defendants are alleged to have participated in a common plan or scheme such as a narcotics conspiracy. See Salameh, 152 F.3d at 115; United States v. Cardascia, 951 F.2d 474, 482 (2d Cir. 1991); United States v. Turoff, 853 F.2d 1037, 1042 (2d Cir. 1988); United States v. Girard, 601 F.2d 69, 72 (2d Cir. 1979). As the Supreme Court has explained:

> Many joint trials — for example, those involving large conspiracies to import and distribute illegal drugs — involve a dozen or more codefendants. . . . It would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability — advantages which sometimes

---

Fed R. Crim. P. 14(a).

> operate to the defendant's benefit.  Even apart
> from these tactical considerations, joint
> trials generally serve the interests of justice
> by avoiding the scandal and inequity of
> inconsistent verdicts.

Richardson v. Marsh, 481 U.S. 200, 210 (1987); see also United

States v. Zafiro, 945 F.2d 881, 886 (7th Cir. 1991) (Posner, J.)

(joint trials reduce not only litigation costs but also "error

costs," i.e., the costs associated from depriving the jury of

making its determinations based on "the full picture"), aff'd, 506

U.S. 534 (1993).

Because of the preference for joint trials of defendants

indicted together, and the near-total discretion afforded the trial

judge in addressing any potential prejudice, a defendant seeking

review of denial of severance under Rule 14 bears an "extremely

difficult burden," United States v. Casamento, 887 F.2d 1141, 1149

(2d Cir. 1989), of showing that he was so prejudiced by the joinder

that he suffered a "miscarriage of justice" or was denied a

constitutionally fair trial.  See United States v. Yousef, 327 F.3d

56, 150 (2d Cir. 2003); United States v. Rosa, 11 F.3d 315, 341 (2d

Cir. 1993).  It is insufficient for a defendant seeking severance

merely to show that he may suffer some prejudice, or may have a

better chance of acquittal at a separate trial.  Torres, 901 F.2d

205, 230 (2d Cir. 1990).  Consequently, "[t]he principles that

guide the district court's consideration of a motion for severance usually counsel denial." Rosa, 11 F.3d at 341.

Quite simply, the strong presumption is that defendants who are indicted together will be tried together. See, e.g., Zafiro, 506 U.S. at 537; United States v. Blount, 291 F.3d 201, 209 (2d Cir. 2002); United States v. Diaz, 176 F.3d 52, 102 (2d Cir. 1999). Given this presumption, the "prejudice" standard is difficult to satisfy and "defendants are not entitled to severance [under Rule 14] merely because they may have a better chance of acquittal in separate trials." Zafiro, 506 U.S. at 540. Even assuming that a particular defendant is somehow prejudiced by joinder, the issue under Rule 14 is whether that prejudice "is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials." United States v. Lanza, 790 F.2d 1015, 1019 (2d Cir. 1986) (citing United States v. Panza, 750 F.2d 1141, 1149 (2d Cir. 1984)). Thus, under the Supreme Court's decision in Zafiro, a discretionary severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence," 506 U.S. at 539.

## C.   **Joinder Is Appropriate**

Green claims that the charges against him were improperly joined with the charges against his co-defendants because there are insufficient allegations to show that Green shared a common plan with or participated in the same series of acts as his codefendants.  (Memorandum of Law in Support of Thomas Green's Pretrial Motions (Docket No. 36) ("Green Severance Br.") at 3-4.)[4] DiBari makes a similar argument in his brief, and Daiker joins in those arguments.  (Memorandum in Support of Defendant Jason DiBari's Joinder in Co-defendants' Severance Motions (Docket No. 85) ("DiBari Severance Br.") at 2; Defendant Daiker's Second Notice of Joinder and Joinder in Co-defendants' Pretrial Motions (Docket No. 88) ("Daiker Severance Br.") at 3-4.)  These arguments are

_____

[4] In support of his argument, Green cites three cases.  The first, United States v. Bernstein, 533 F.2d 775 (2d Cir. 1976) supports the Government's position.  Bernstein involved a challenge to the joinder of a conspiracy count with substantive counts arising out of the same conspiracy.  The court in Bernstein held that the joinder was proper, and noted that the charge of conspiracy itself "provides a common link."  553 F. 2d at 789.  The other two cases cited by Green are factually inapposite.  United States v. Castiglia, 1986 WL 6873 (W.D.N.Y. 1986), involved severance of a four-defendant conspiracy from a separate conspiracy charge that involved only two of the four defendants charged in the first conspiracy.  Similarly, in Kotteakos v. United States, 328 U.S. 750 (1946), one defendant obtained fraudulent loans for various people who were not aware of the loan schemes involving the others.  Here, in contrast, all of the defendants are charged with participating in the same narcotics conspiracy, which they all understood involved the illegal possession and sale of marijuana.

specious and should be swiftly rejected.  Because Green, DiBari and
Daiker are charged in an indictment with a single count of
conspiracy, they are both properly charged along with their co-
defendants in that count.  See <u>Uccio</u>, 917 F.2d at 87; <u>Nerlinger</u>,
862 F.2d at 973; <u>Friedman</u>, 854 F.2d at 561 ("<u>The mere allegation of</u>
<u>a conspiracy presumptively satisfies Rule 8(b)</u>, since the
allegation implies that the defendants named have engaged in the
same series of acts or transactions constituting an offense.")
(emphasis added).  There is therefore no colorable claim under Rule
8(b) that joinder was improper here.

### D. **The Severance Motions Are Premature**

The Court should deny the motions for severance in the
first instance, with leave to refile, because they are premature.
At this stage, arguments for severance are speculative, as it is
uncertain how many (and which) defendants will plead guilty prior
to trial.  See, e.g., <u>United States</u> v. <u>Minaya</u>, 395 F. Supp. 2d 28,
42-43 (S.D.N.Y. 2005) (denying motion for severance as premature,
based on possibility that number of defendants would decrease
before commencement of trial); <u>United States</u> v. <u>Kevin</u>, No. 97 Cr.
763 (JGK), 1999 WL 194749, at *12 (S.D.N.Y. Apr. 7, 1999) (denying
motion for severance as premature based on possibility of pleas by
defendants and limitations on scope of trial through pre-trial
rulings); <u>United States</u> v. <u>Heatley</u>, No. S2 96 Cr. 515 (SS), 1997 WL

- 14 -

12961, at *2 (S.D.N.Y. Jan. 14, 1997) (denying severance motion as premature) (collecting cases).  Accordingly, the Court should deny the motions for severance with leave to refile shortly before the March 12, 2012 trial date.

**E.  The Defendants Have Not Carried Their Burden Of Showing That They Would Be So Prejudiced By Joinder That They Would Be Denied A Fair Trial**

Should the Court consider the merits of the severance motions at this stage, however, it should deny them as meritless. Nearly all of Green, Cunnius and DiBari's arguments are variations of the common refrain that they will suffer "spillover prejudice" from evidence of the co-defendants' drug-related activities if they are tried with their co-defendants.  (Green Severance Br. at 2-6; Cunnius Severance Br. at 2-6; DiBari Severance Br. at 2-5.)  These claims are meritless.

As an initial matter, it is well settled that "[d]iffering levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials."  United States v. Chang An-Lo, 851 F.2d 547, 557 (2d Cir. 1988) (quoting United States v. Carson, 702 F.2d 351, 366-67 (2d Cir. 1983)); see also United States v. Zackson, 6 F.3d 911, 922 (2d Cir. 1993) (same).  Indeed, the Second Circuit "has repeatedly recognized that joint trials involving defendants who are only marginally involved alongside those heavily involved are

- 15 -

constitutionally permissible." <u>United States</u> v. <u>Locasio</u>, 6 F.3d
924, 947 (2d Cir. 1993); <u>see also Carson</u>, 702 F.2d at 366-367 (fact
that defendant played a less prominent role in the conspiracy than
many of his co-conspirators was not a sufficient ground for a
separate trial); <u>United States</u> v. <u>Aloi</u>, 511 F.2d 585, 598 (2d Cir.
1975) (individual trials are not warranted merely because of
"differences in degree of guilt and possibly degree of notoriety of
defendants").

        In any event, in this case, the proof is strong against
each defendant.  For instance, the Government expects the evidence
against Green and Cunnius to include co-conspirator testimony
regarding Green and Cunnius' participation in the conspiracy,
including their participation in the marijuana transaction on
December 2, 2009; vehicle records linking Green to the narcotics
activities of December 2, 2009; rental records linking Cunnius to a
warehouse where marijuana was stored; threatening documents seized
from CC-4 at the home of CC-1 discussing Cunnius and Green; and an
audiotape in which Cunnius discusses the marijuana conspiracy and
the threatening letter with CC-1.  The Government expects the
evidence against McFarlane to include co-conspirator testimony,
surveillance of McFarlane by agents on December 2, 2009; and
vehicle records tying McFarlane to the activities on that date.  In
addition, the Government expects co-conspirator testimony to

- 16 -

establish that DiBari and Daiker provided marijuana to members of
the conspiracy in California, which was then shipped to New York,
including to the warehouse rented by Cunnius, where it would often
be processed by Green.  Proceeds from these shipments would then be
driven back across the country to California, including in vehicles
with hidden compartments.  The co-conspirator testimony is expected
to be corroborated with evidence of traffic stops of vehicles
containing hidden compartments that were registered to DiBari and
Daiker, respectively.  In sum, even if significant disparities of
proof afforded grounds for severance – and they do not – severance
would be unwarranted in light of the strong proof against each
defendant.

        Moreover, in protesting the admission at their trials of
evidence pertaining principally to their co-defendants, defendants
ignore that the evidence against their co-defendants would be
admissible at a trial involving each of them alone because that
evidence is relevant to proving the nature and scope of the
conspiracy in which each of them was involved.  See United States
v. Spinelli, 352 F.3d 48, 55-56 (2d Cir. 2003); United States v.
Harris, No. 00 Cr. 105 (RPP), 2000 WL 1229263, at *2 (S.D.N.Y. Aug.
29, 2000) ("Evidence at the joint trial of alleged co-conspirators
that, because of the alleged conspiratorial nature of the illegal
activity, would have been admissible at a separate trial of the

moving defendant is neither spillover nor prejudicial.") (quoting United States v. Rosa, 11 F.3d 315, 341 (2d Cir. 1993)).  Because the Government would present evidence of the larger conspiracy in which Green, Cunnius, McFarlane, DiBari and Daiker participated, regardless of whether the defendants were tried separately or together, the defendants' conclusory claims that they will suffer "spillover prejudice" if the defendants were not severed are not compelling.

Cunnius and DiBari's specific claims of "prejudicial spillover" from Green's involvement in threats to CC-1 are entirely illusory for several reasons.  First, evidence of the threatening communication would be admissible against all defendants because it is well-established that evidence of the criminal activities of other members of a marijuana conspiracy, such as the threats, is admissible against a defendant as proof of the existence of the charged conspiracy and as proof of the nature, purposes and activities of that conspiracy.[5]  It is axiomatic that "[w]here a

---

[5]      Cunnius cites United States v. Burke, 784 F. Supp 2d 395 (E.D.N.Y. 2011), to support his argument that Green's trial should be severed from his.  Burke is distinguishable in at least two respects.  First, unlike here, where all defendants are charged in the same conspiracy, the severed defendant was charged only with witness tampering while the other two defendants were charged with various RICO violations, making the the proof substantially different and the risk of prejudicial spillover significant.  Id. at 399.  Second, there was no risk of inconsistent verdicts or a favorable position for the last-

defendant is a member of a conspiracy, all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant." Salameh, 152 F.3d at 111; see also United States v. Brady, 26 F.3d 282, 287 (2d Cir. 1994) (evidence of specific acts that do not pertain directly to proof of crimes committed by other individuals in a RICO conspiracy was relevant to show the existence and nature of the enterprise); United States v. Gotti, 02 Cr. 743 (RCC), 2004 WL 602689, at *5-8 (S.D.N.Y. Mar. 26, 2004) (denying motion for severance by RICO defendant not charged with murder claiming prejudicial spillover from the admission of other defendants' violence and murders).  Indeed, "'the cases are legion that there is a strong public interest in joint trials where, as here, the defendants are both charged in the conspiracy.'" United States v. Guerrero, 669 F. Supp. 2d 417, 425 (S.D.N.Y. 2009) (citation omitted).  To this end, "[i]n conspiracy cases, especially, any claim of 'prejudicial spillover' does not justify severance because the evidence would be admissible at a separate trial of the moving defendant." Id.

      Notably, the Second Circuit has found unavailing the argument that a joint trial results in substantial prejudice because a jury may hear testimony of violent behavior unrelated to

---

tried defendant, as there would be here. Id. at 400.

a particular defendant.  See Spilleni, 352 F.3d at 55 (rejecting a
defendant's argument that substantial prejudice resulted from
failure to sever him from his co-defendant brother despite
testimony "from prosecution witnesses [who] related in graphic
detail [his brother's] violent and murderous criminal history, a
history [the defendant] did not share").  Because evidence of this
criminal conduct would be admissible against all defendants,
separate trials would result in little more than duplication of
efforts that would be burdensome and could needlessly disadvantage
the public, the Court, and the Government with lengthy, repetitive
trials.

      Moreover, the evidence of the threats to which Cunnius
objects would be highly probative not just of the existence of the
conspiracy but of Cunnius's role in it.  The statements in the
threatening letter referencing the activities of "R" (for Richard)
and "T" (for Thomas) – which constitute co-conspirator statements –
are highly probative of Cunnius' participation in the Organization.
Second, the later recorded conversation in which Cunnius and CC-1
discuss the marijuana conspiracy and the threatening letter is
extraordinarily probative of Cunnius' involvement in the
conspiracy.  Finally, because in the recorded conversation, Cunnius
denies any knowledge of the threats and pledges to assist in
dissipating them, there is little basis to imagine that Cunnius

- 20 -

will suffer from unfair prejudice based upon jurors' assessment of his own role in potentially violent conduct.  In sum, contrary to Cunnius's bald claim that the evidence of Green's violence "is neither relevant nor admissible" against Cunnius, (Cunnius Br. at 6), the threats against CC-1 would be admissible evidence of the existence of the narcotics conspiracy and of Cunnius's role in it.

Finally, even if the evidence of the attempted threats were not admissible against Cunnius or the other co-defendants, the mere introduction against some defendants of evidence of attempted violence or other crimes not committed by the other defendants is not sufficiently prejudicial to warrant severance. See United States v. Hernandez, 85 F.3d 1023, 1029-30 (2d Cir. 1996); Rosa, 11 F.3d at 341-42; United States v. DeVillo, 983 F.2d 1185, 1192-93 (2d Cir. 1993); United States v. Lasanta, 978 F.2d 1300, 1306 (2d Cir. 1992).  DeVillo is particularly instructive on this point.  There, appellants, who were charged in just one burglary count, moved for severance from their co-defendants -- who were charged with racketeering, racketeering conspiracy, six other burglaries, and an attempted murder -- arguing that the racketeering conspiracy and acts of violence created a prejudicial "spillover effect."  983 F.2d at 1192. Citing the district court's "explicit limiting instruction to the jurors that . . . testimony [concerning violence] could not

- 21 -

be used against" appellants, the Second Circuit rejected appellants' argument and upheld the district court's refusal to sever.  Id. at 1192-93; see also United States v. Garcia, 848 F.2d 1324, 1334 (2d Cir. 1988) (rejecting non-RICO defendant's request for severance from RICO defendants charged with multiple racketeering and narcotics trafficking counts).

Finally, if the Court assessed that spillover prejudice could occur, it could be corrected by the Court's instruction that the jury consider the guilt of each defendant individually -- an instruction that jurors are presumed to be able to follow.  See United States v. Potamitis, 739 F.2d 784, 790 (2d Cir. 1984); see also Lasanta, 978 F.2d at 1307 ("[t]he district court countered any possible spillover with specific instructions to the jury . . . that the jury should consider the evidence separately against each defendant"); Zackson, 6 F.3d at 922; Guerrero, 669 F. Supp. 2d at 425.  Here, the jury should easily be able to segregate the acts committed by Green.  There is simply no reason to believe that a properly instructed jury will be unable to segregate the proof against each defendant.[6]

---

[6]  Cunnius also claims there may be a conflict between defenses, but does not specify what that conflict may be nor is the Government aware of a potential conflicting defense that would be prejudicial to him or his co-defendants.  An opposing theory of defense does not, by itself, require severance.  United States v. Carpentier, 689 F.2d 21, 27-28 (2d Cir.1982).  Severance is only

**F.   Severing Defendants Would Waste Judicial Resources And Create A Duplication Of Efforts**

A severance is also inappropriate here because this is not a case in which prejudice "is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials." Lanza, 790 F.2d at 1019 (internal quotation marks omitted).  The presumption in favor of joint trials "conserves judicial resources, alleviates the burden on citizens serving as jurors, and avoids the necessity of having witnesses reiterate testimony in a series of trials." United States v. Lyles, 593 F.2d 182, 191 (2d Cir. 1979) (internal quotation marks omitted); United States v. Corr, 543 F.2d 1042, 1052 (2d Cir. 1976).

A severance of the charges against the defendants here would result in significant duplication of efforts and waste of judicial resources.  The Government would present substantially the same, if not exactly the same, evidence of the existence of the conspiracy in multiple trials.  Presenting such testimony in

---

appropriate where, in order to believe the core of testimony offered on behalf of one defendant, the jury must necessarily disbelieve the testimony offered on behalf of his co-defendant. Id. at 28.  A claim of such a conflict has not, and could not, be advanced here.  In short, none of the reasons advanced by the defendants is sufficient to carry their burden of proving to this Court that not granting a severance would result in a "miscarriage of justice."

- 23 -

multiple trials would unnecessarily consume substantial judicial resources.  It would also require law enforcement, lay and cooperating witnesses "to repeat the inconvenience (and sometimes trauma) of testifying." Richardson, 481 U.S. at 210.  Severing the charges against the defendants would also favor the defendant or defendants who are tried last because they – randomly and arbitrarily – will have had a preview of the Government's case. Id.  For the foregoing reasons, the Government respectfully submits that if the severance motions are not denied as premature with leave to refile, they should be denied in their entirety.

## II.  JASON DIBARI'S MOTION TO SUPPRESS EVIDENCE SHOULD BE DENIED FOLLOWING AN EVIDENTIARY HEARING

Jason DiBari moves to suppress "any physical evidence seized or observed" from his person, vehicle, or residence on the date of his arrest; any statements of DiBari on the date of his arrest; any "observations and opinions of law enforcement officers" as a result of "unlawful warrantless searches and seizures"; and any other evidence constituting the fruits of the searches and seizures, including the contents of the cellular phones that were taken on the date of DiBari's arrest.

At trial, the Government expects that it would offer as evidence testimony concerning DiBari's initial statement to law enforcement agents upon arrest and his granting of consent to

search; the cellular phones (and their contents) seized from DiBari's car and home and the seized financial records from DiBari's car; and testimony concerning the items that agents observed during their consent search of DiBari's home.  As a consequence, the Government consents to a hearing regarding the admissibility of the evidence it would seek to offer at trial. The Government expects that the evidence at a hearing will establish that evidence of the relevant statements, searches, and seizures is admissible because the evidence was obtained in a manner consistent with DiBari's Fourth and Fifth Amendment rights.

### A.  Background

#### 1. Charges and Evidence Relating To Vehicles, Cellular Phones, and Cash

The Government expects the evidence at a suppression hearing would show that on June 1, 2011, agents went to the home of Jason DiBari, a/k/a "Mutt," to execute a warrant issued in the Southern District of New York for DiBari's arrest on charges of conspiring to distribute narcotics.  As set forth in Complaint 11 Mag. 1181, agents had identified DiBari as a principal supplier of marijuana to a drug trafficking organization that was distributing thousands of kilograms of the drug in the New York City area.  The statements of cooperating

witnesses and other evidence indicated that over the course of
the conspiracy, DiBari — acting in concert with co-defendant
Cory Daiker, a/k/a "Skinny," among others — provided marijuana
to a New York based distribution cell led by co-conspirator
David Adams, and received enormous cash payments in return.

Evidence obtained prior to DiBari's arrest also
established that DiBari and co-conspirators were using vehicles
to transport drugs and drug proceeds and were using cellular
phones in furtherance of the conspiracy.  With respect to
vehicles, one cooperating witness ("CW-1") had told agents that
the witness had met with associates of DiBari in order to learn
how to operate a hydraulic trap contained in a tractor-trailer
that was to be used for transporting drugs. (Compl. ¶  8(d).)
CW-1 was also told in or around the spring of 2009 that a
vehicle containing narcotics proceeds bound for DiBari had been
stopped by law enforcement agents in Ohio and the money had been
seized. (Compl. ¶  8(e).)  A second cooperating witness ("CW-2")
recalled personally packaging drug proceeds on behalf of David
Adams that were to be sent to DiBari.  (Compl. ¶ 9(a).)  CW-2
also learned in or about spring 2009 that about $1 million in
proceeds bound for DiBari had been seized in Ohio. (Compl. ¶
9(b).)  A third former member of the conspiracy ("CS-1"), who
understood DiBari to work with Cory Daiker, a/k/a "Skinny," and

- 26 -

with two other individuals known as "Woodelf" and "Alpine" in supplying narcotics to the organization, recalled receiving drugs on multiple occasions from "Alpine" that were transported to CS-1 in a trailer that contained a hidden compartment.

Evidence obtained in vehicle stops also tied DiBari to the use of vehicles to transport drugs and drug proceeds. First, investigating agents learned through police records that state police officers in Ohio had seized $1,032,940 from a pick-up truck registered to Cory Daiker, a/k/a "Skinny," during a traffic stop in spring 2009 — the time of the $1 million Ohio seizure of proceeds bound for DiBari described by cooperating witnesses. (Compl. ¶ 11(b).) Phone records indicated that DiBari had been in contact with one of the individuals in the stopped vehicle several weeks before the stop. Second, investigating agents learned through police records that, in Nebraska, a vehicle registered to DiBari had been stopped by police and found to contain a hidden compartment. (Compl. ¶ 11(a).) During that stop, which occurred in September 2007, the hidden compartment was empty. (Compl. ¶ 11(a).)

Multiple sources provided evidence that DiBari used cellular phones in furtherance of the conspiracy. Agents had seized from other defendants in the charged conspiracy phones that provided evidence that co-conspirators were using phones to

- 27 -

communicate with each other.  CS-1 had advised agents that DiBari had given encrypted Blackberries to CS-1 so that members of the conspiracy could coordinate their activity.  And, as noted above, toll records and other evidence establish that in the weeks before the Ohio stop, a phone registered to DiBari had been used to contact one of the individuals driving his narcotics proceeds across the country.

Evidence also indicated that members of the conspiracy — including DiBari — trafficked in large quantities of cash. Not only had agents seized more than $1,000,000 bound for DiBari, as noted above, but agents had seized $400,000 from the residence of David Adams, the New York distribution coordinator. In addition, agents had learned from cooperating witnesses about other large sums of money handled by the organization, such as $350,000 that Adams brought with him to a meeting with DiBari in the fall of 2008.

## 2.  Arrest, Search and Seizure

On June 1, 2011, agents seeking to arrest DiBari on the New York charges apprehended him as he pulled out of a driveway connected to his residence and onto a public roadway. Agents were aware that DiBari had a firearm registered to him at the time they conducted the stop.  DiBari was driving a 2010 silver BMW in which he was the only passenger.

- 28 -

After taking the defendant into custody, an agent moved the car out of the roadway and turned the engine off. The agent could observe three cellular phones in plain view in the BMW. The agent also observed a grocery-store style bag in the back seat of the defendant's car. Before securing the car and leaving it on the side of the road, the agent sought to locate any valuables inside for inventory purposes and to determine if the vehicle contained any contraband. Inside the bag in the back seat of the car, the agent found financial documents, contained in an envelope. Agents took custody of the cellular phones and the financial documents before securing the vehicle and leaving it on DiBari's property.

Agents advised DiBari of the warrant for his arrest and the charges against him. As one of the agents was explaining the identity of the arresting agents and the charges, DiBari stated, in sum and substance, that things people are saying about him are hearsay.

DiBari agreed to go into his residence for further discussion. Inside the residence, an agent asked DiBari if he had firearms in the home. After DiBari stated that he had firearms in a safe downstairs, DiBari agreed to open the safe and show the agent the firearms. DiBari led the agents to the lower level of his residence, where he showed them two safes

- 29 -

within a walk-in closet space.  Inside the walk-in closet,
agents observed a bulletproof vest and a shotgun.

The first safe in the walk-in closet contained jewelry
in a bag that DiBari stated he had gotten from his grandparents,
a computer hard drive, photographs of black males that DiBari
stated were of people he had met in Africa; and DiBari's
passport.  Agents took custody of the passport and left the
remaining items.  In a second safe were two handguns;
ammunition; a wool ski cap with a bandana tied inside the ski
cap; and a stun gun. Agents left the items in DiBari's home.
DiBari showed the agents a third safe, which was open and empty.

After DiBari smoked, used the bathroom, and made a
telephone call, an agent asked DiBari if he had other contraband
in the house. After DiBari stated that he did not, DiBari gave
verbal consent for the agents to look through the premises.
Inside another room being used as a walk-in closet for men's
clothes, agents found a duffel bag that contained an additional
stun gun and another cellular phone.  Agents seized that
cellular phone.

## B.   Legal Analysis

The Government consents to a hearing regarding the
admissibility of the statements of DiBari that the Government
would seek to introduce at trial, regarding the admissibility of

agent testimony concerning the consent search of DiBari's home,
and regarding the admissibility of the phones and financial
records seized by agents.   The Government expects that
testimony at the hearing will establish that the evidence
described above is admissible because it was obtained in
conformity with the defendant's Fourth and Fifth Amendment
rights.

1.   **The Statements the Government Would Seek to Introduce
     at Trial are Admissible Because They Were Voluntary
     and not the Product of Interrogation**

With respect to the defendant's statement upon being
advised of the charges that, in substance, the things people
were saying about him were hearsay, the Government expects that
evidence at the hearing will establish that the defendant's
statement is admissible because it was voluntary and not the
product of interrogation.  While Government agents must provide
Miranda warnings before they interrogate a suspect in custody,
see Miranda v. Arizona, 384 U.S. 436, 444-45 (1966), such
warnings are required only when a suspect is in fact
interrogated.  The Miranda requirement does not apply to
voluntary statements made by a defendant to law enforcement that
are not the product of interrogation. Rhode Island v. Innis,
446 U.S. 291, 301 (1980); United States v. Guido, 704 F.2d 675,
676-77 (2d Cir. 1983).  "Interrogation," for purposes of

- 31 -

Miranda, refers to "express questioning or its functional
equivalent" of a person in custody; that is, "any words or
actions on the part of the police . . . that the police should
know are reasonably likely to elicit an incriminating response
from the suspect." Innis, 446 U.S. at 301. Here, the
Government expects that the evidence will show that the
defendant's statements that the things people were saying about
him were hearsay were not the product of questioning by law
enforcement agents. Rather, the statements were volunteered by
the defendant after he was advised of the charges against him.
Further, the statements were not taken under the kind of
circumstances that would overbear the defendant's will or
otherwise render them involuntary. See Schneckloth v.
Bustamonte, 412 U.S. 218, 226 (1973).

       The defendant's consent to the search of his residence
is also admissible because, as every court of appeals to address
this question has held, a request for consent to search does not
constitute interrogation. United States v. McCurdy, 40 F.3d
1111, 1118 (10th Cir.1994); United States v. Smith, 3 F.3d 1088,
1098 (7th Cir. 1993) United States v. Hidalgo, 7 F.3d 1566, 1568
(11th Cir.1993); Cody v. Solem, 755 F.2d 1323, 1330 (8th Cir.
1985); Smith v. Wainwright, 581 F.2d 1149, 1152 (5th Cir.1978);
United States v. Lemon, 550 F.2d 467, 472 (9th Cir.1977). In

- 32 -

particular, because a defendant's consent to search is not
itself incriminating, an agent's request for consent is not a
question designed to elicit an incriminating response.  United
States v. Smith, 581 F.3d at 1098.

> **2.  Law Enforcement Officers' Testimony Concerning Their
> Observations While in the Defendant's Residence is
> Admissible Because the Defendant Consented to a Search
> of the Home**

The Government expects that testimony at the
evidentiary hearing will establish that officers' search of
DiBari's residence was permitted under the Fourth Amendment
because the defendant consented to the search.  Because the
"Fourth Amendment does not forbid all searches, only
unreasonable ones," the Supreme Court has "long approved
consensual searches because it is no doubt reasonable for police
to conduct a search once they have been permitted to do so."
Florida v. Jimeno, 500 U.S. 248, 250-251 (1991).  Thus, "[i]t is
well settled that a warrantless search does not violate the
Fourth Amendment if 'the authorities have obtained the voluntary
consent of a person authorized to grant such consent,' and that
'[s]o long as the police do not coerce consent, a search
conducted on the basis of consent is not an unreasonable
search.'"  United States v. Hernandez, 85 F.3d 1023, 1028 (2d
Cir. 1996) (citations omitted).  The scope of the permitted

- 33 -

search is measured by a standard of objective reasonableness:
"What would the typical reasonable person have understood by the
exchange between the officer and the subject?" Jimeno, 500 U.S.
at 250-251.  Under this standard, a defendant's general consent
to a search of an area includes a search of containers within
the area.  Id. at 251-252.  Here, the Government expects
testimony to show that DiBari permitted agents to enter his
house after he was arrested; agreed to show agents the firearms
he had in the house; and then consented to the agents' searching
the house for other contraband.  As a result, there are no
grounds to suppress the agents' testimony concerning their
observations during the search.

### 3. Law Enforcement Officers Were Entitled to Seize Cellular Phones and Financial Papers on the Date of the Defendant's Arrest

The Government expects evidence at a hearing will
establish that agents were entitled to seize cellular phones and
financial records on the date of DiBari's arrest.  Agents were
entitled to search DiBari's BMW both because it was reasonable
to believe evidence of a crime might be found in the vehicle and
because agents were entitled to conduct an inventory search for
valuable items before securing the BMW and leaving it
unattended.  Moreover, when the agents lawfully observed
cellular phones and financial records in DiBari's vehicle, the

- 34 -

agents were entitled to seize those items because they had

probable cause to believe they were evidence, fruits, or

instrumentalities of drug trafficking.

>    *a. Agents Were Entitled to Search DiBari's Car*
>    *Because the Offense of Arrest and Other Facts Known to*
>    *the Agents Gave Them Reason to Believe Evidence*
>    *Relevant to Drug Trafficking Would be in the BMW*

Agents were entitled to search DiBari's BMW after his

arrest pursuant to <u>Arizona</u> v. <u>Gant</u>, 556 U.S. 332, 129 S. Ct.

1710 (2009), which held that "circumstances unique to the

vehicle context justify a search incident to a lawful arrest

when it is 'reasonable to believe evidence relevant to the crime

of arrest might be found in the vehicle.'" 129 S. Ct. at 1719

(citing <u>Thornton</u> v. <u>United States</u>, 541 U.S. 615, 632 (2004)

(Scalia, J., concurring)). <u>Gant</u> explained that whether such a

search is reasonable will depend upon the crime for which the

defendant is arrested. In cases when a recent occupant is

arrested for a traffic violation, there will be no reasonable

basis to believe the vehicle contains relevant evidence. <u>Id.</u>

(citations omitted). However, in other cases, "the offense of

arrest will supply a basis for searching the passenger

compartment of an arrestee's vehicle and any containers

therein." <u>Id.</u> The Court cited as examples of cases in which

the offense of arrest would afford a basis to search <u>New York</u> v.

Belton, 453 U.S. 454 (1981) and Thornton, each of which involved arrests for drug offenses.  Id.

Law enforcement agents arresting DiBari were entitled to search his vehicle under Gant because the charge against DiBari and the other evidence in the agents' possession made it "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle."  129 S. Ct. at 1719 (citation omitted).  Agents were arresting DiBari for a drug crime — precisely the type of offense that the Supreme Court indicated in Gant, Belton, and Thornton justified agents' searching a car in which the arrestee had recently been located.  Moreover, as set forth above, agents had repeatedly linked DiBari to the use of vehicles to transport drugs and drug proceeds through car stops and cooperator debriefings.  Finally, agents could see three cellular phones in plain view on the front seat of DiBari's car — items that, as set forth infra, agents had probable cause to believe were evidence of the charged narcotics conspiracy.

> b.  *Agents Were Entitled to Conduct an Inventory Search of DiBari's Car Before Leaving it Unattended Following DiBari's Arrest*

Second, law enforcement agents were justified in searching DiBari's vehicle as an inventory search for valuable items before they secured the vehicle and left it unattended

subsequent to DiBari's arrest.  It is well-established that law
enforcement agents "may search [a] vehicle and make an inventory
of its contents without need for a search warrant and without
regard to whether there is probable cause to suspect that the
vehicle contains contraband or evidence of criminal conduct"
when they impound a vehicle.  United States v. Lopez, 547 F.3d
364, 369 (2d Cir. 2008) (citing cases); see also United States
v. Thompson, 29 F.3d 62, 65 (2d Cir. 1994) ("Regarding the
propriety of a search incident to an arrest, inventory searches
of items lawfully obtained by the police fall within a well-
defined exception to the Fourth Amendment's warrant
requirement.").

        Law enforcement agents may also secure a vehicle at
the scene of an arrest without impounding it.  See United States
v. Scott, 665 F.2d 874, 876-877 (9th Cir. 1981) (police conduct
comported with Fourth Amendment when officer entered legally
parked car to make it secure and removed a visible valuable
item); United States v. Prazak, 500 F.2d 1216 (9th Cir. 1974);
see also Colorado v. Bertine, 479 U.S. 367, 372-373 (1987)
(describing community caretaking activities as compatible with
Fourth Amendment).  The need to secure a vehicle and any
dangerous items is particularly acute where, as here, agents
have reason to believe the occupant has a firearm but had not

yet located that gun.  See Cady v. Dombrowski,  413 U.S. 433
(1973).

Where a car is secured at a scene but not impounded,
an officer may also conduct an inventory search. See United
States v. Little, 945 F. Supp. 79, 84 (S.D.N.Y. 1996) (upholding
inventory search of vehicle though vehicle was not ultimately
impounded); see also United States v. Scott, 665 F.2d 874 (9th
Cir. 1981) (search of automobile could be upheld where police
acted to secure automobile).  To be lawful, an inventory search
must be reasonable.  Lopez, 547 F.3d at 370. The reasonableness
of an inventory search is determined by whether the officials
conducing the search, "act[ed] in good faith pursuant to
standardized criteria . . . or established routine."  Id.
(quoting Thompson, 29 F.3d at 65) (internal quotes and citation
omitted); see also Florida v. Wells, 495 U.S. 1, 4 (1990) (law
enforcement officials may open closed containers as part of an
inventory search so long as they act in good faith pursuant to
"standardized criteria . . . or established routine").

The Government expects evidence adduced at a hearing
will show that agents were justified in conducting an inventory
search of DiBari's BMW before they secured the vehicle and left
it unattended.  The Government expects evidence to show that
when DiBari was placed under arrest, the keys to his car were in

- 38 -

the ignition, the car door was open, and the vehicle was located at a position that the arresting agents considered unsafe.  As a result, the arresting agents properly entered the car, moved the vehicle, and secured it near the location of DiBari's arrest before leaving the scene.  The Government expects that testimony at a hearing will establish that agents' regular procedures called for searching a vehicle for valuable or dangerous items before securing it under such circumstances.  As a result, the Government expects the evidence at a hearing to demonstrate that the agents' search of DiBari's BMW was justified as a lawful inventory search.

> c. Agents Acted Lawfully in Seizing Cellular Phones
> and Financial Records From the Defendant's Car

Finally, the Government expects evidence adduced at a hearing would show that agents were entitled to seize the multiple cellular phones and financial records they recovered from DiBari's car once they lawfully observed those items, because the agents had probable cause to believe the seized items constituted evidence, fruit, or instrumentalities of drug trafficking.  Under Horton v. California, 496 U.S. 128 (1990), among other cases, police may lawfully seize an object without a warrant if (a) the officers are lawfully in a position at which they can observe the object; (b) the object's incriminating

character is immediately apparent to the police, meaning that
officers have probable cause to believe the item seized
constitutes evidence of a crime; and (c) the officers have a
lawful right of access to the object.  See also Texas v. Brown,
460 U.S. 730, 741-742 (1983).  In light of the automobile
exception that allows warrantless seizures from vehicles based
on probable cause, see United States v. Ross, 456 U.S. 798, 820-
21 (1982), when an officer observes in plain view within a car
items that he has probable cause to believe constitute fruits,
evidence, or instrumentalities of a crime, they officer may
seize the items. See, e.g., Colorado v. Bannister, 449 U.S. 1
(1980) (per curiam).

     The Government expects evidence adduced at a hearing
will establish that the arresting officers had probable cause to
believe that the multiple cellular phones in the defendant's car
were evidence, fruits, and instrumentalities of drug trafficking
for several reasons.[7]  First, in the arresting officers' training
and experience — and as courts themselves have frequently
observed — drug traffickers routinely use cellular phones to
coordinate their activities, and their phones routinely contain

---

[7]   Because the cellular phones were in plain view in DiBari's
vehicle prior to any search, the lawfulness of these seizures
does not depend on the lawfulness of the search of DiBari's BMW
as a whole.

evidence of drug trafficking. See, e.g., United States v.
Cleveland, 106 F.3d 1056, 1061 (1st Cir. 1997); United States v.
Slater, 971 F.2d 626, 637 (10th Cir. 1992); see also United
States v. Gaskin, 364 F.3d 438 (2d Cir. 2004); United States v.
Brown, 676 F. Supp. 2d 220 (S.D.N.Y. 2009). Because of the
routine use of cellular phones in drug conspiracies, "[t]here is
authority for the proposition that cell phones and pagers in
drug-trafficking investigations may come within the plain view
exception to the warrant requirement as items akin to
contraband, in that they are often tools of the drug trafficking
trade," United States v. Santillan, 571 F. Supp. 2d 1093, 1100-
1101 (D. Ariz. 2008) (citing cases), and "[c]ourts have
generally permitted law enforcement officers to conduct
warrantless searches of cell phones in cases involving
drug-trafficking, where evidence of the crime is likely stored
on the phones." United States v. Davis, 787 F. Supp. 2d 1165,
1171 (D. Or. 2011); see also, e.g., United States v. Fierros-
Alavarez, 549 F.Supp. 2d 1206, 1212 (D. Kan. 2008); United
States v. Lam, 2006 WL 2864019 (W.D.N.Y. May 23, 2006), report
and recommendation adopted by United States v. Tran, 2006 WL
2884144 (W.D.N.Y. Oct. 4, 2006).

        Moreover, the Government expects testimony to establish
that the arresting agents also had specific evidence that DiBari

used cellular phones in connection with drug crimes. The evidence included a confidential source's statements that DiBari had provided encrypted Blackberry phones to members of the conspiracy for use in communicating and evidence that DiBari had communicated by phone to arrange a meeting with an individual who was stopped several weeks later transporting what a cooperating witness had identified as approximately $1,000,000 in narcotics proceeds bound for DiBari in California. As a result, there was ample probable cause for the agents' seizure of cellular phones in plain view in DiBari's car. Similarly, once agents observed another cellular phone while present in DiBari's home during a lawful consent search, the same considerations provided probable cause to seize that phone.

The Government expects testimony to further establish that agents had probable cause to believe that financial records they lawfully observed in DiBari's BMW constituted evidence, fruits, or instrumentalities of drug trafficking. In the agents' training and experience, the financial records of high-level narcotics suppliers receiving large cash payments routinely reflect large cash deposits that constitute evidence of criminal activity. See United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985) (relying on agent's training and experience that "major drug traffickers frequently maintain at their homes large

- 42 -

amounts of cash, drugs, books, ledgers and other documents
evidencing their criminal activities"); United States v. Cruz,
785 F.2d 399, 405-06 (2d Cir. 1986) (confirming propriety of
magistrate's reliance on agents' expert opinion about where
narcotics offenders maintain records); United States v. Young,
745 F.2d 733, 758 (2d Cir. 1984) (holding that "the [M]agistrate
was entitled to credit [agent's] specialized knowledge about the
practices of narcotics dealers").   In addition, the Government
expects testimony to establish that agents had case-specific
reasons to believe that DiBari's financial records would reflect
his narcotics activities, because the statements of cooperating
witnesses — corroborated by the Ohio seizure of over $1,000,000
— provided evidence that DiBari was receiving enormous sums of
cash for the drugs that he sold.   In sum, the Government expects
evidence at a hearing will establish that agents were entitled
to search DiBari's BMW as a lawful inventory search and as a
search incident to DiBari's arrest on drug charges and will
further establish that agents lawfully seized cellular phones
and financial records during their search.

**III.  DAIKER'S MOTION TO SUPPRESS SHOULD BE DENIED**

Defendant Cory Daiker has filed a motion to suppress
evidence obtained during the March 25, 2009, stop and search of
a 2003 Chevy Silverado (the "Silverado"), registered to Daiker,

by Ohio State Troopers, as well as evidence derived from this
search.  Daiker's motion to suppress should be denied without an
evidentiary hearing because: (1) Daiker lacks standing to
challenge the search; and (2) there are no material facts in
dispute that would require an evidentiary hearing in any event,
because the sworn testimony of a law enforcement agent
establishes that the search was conducted in accordance with the
Fourth Amendment and Daiker has not put any facts underlying the
stop into dispute through an affidavit.

### A. Background

On March 25, 2009, Ohio State Troopers Alejo Romero
and Stacy Arnold were on patrol in Trooper Romero's vehicle on
Interstate 80 in Ohio.  (Transcript of Trooper Romero's Sworn
Testimony on August 12, 2011 ("Tr.") 38:11-39:2.)[8]  While Romero
and Arnold were watching traffic from a stationary patrol car,
Romero observed a black Chevrolet Silverado pick-up truck
approaching their location.  (Tr. 39:3-11; Tr. 154:24-155:2.)
After the truck passed Trooper Romero, he noticed that the
vehicle was slowing down for no apparent reason.  (Tr. 39:8-

---

[8] Romero's testimony was adduced during the first session of
a suppression hearing in a forfeiture action at which DiBari's
counsel represented the defendant, U.S. v. $1,033,000.00, Docket
No. 3:10CV157 (N. D. Ohio Aug. 12, 2011).  The transcript of
Romero's testimony is attached hereto as Exhibit A.  The second
session of that suppression hearing was held on Sept. 12, 2011.

40:4.)  Trooper Romero also noticed that the spare tire, which
was mounted underneath the truck, appeared extremely low - much
lower than it would be on a normal truck.  (Tr. 40:7-10.)
Trooper Romero based this opinion on his experience of being on
the road for 18 years and stopping thousands and thousands of
vehicles.  (Tr. 40:11-17.)  At that point, Trooper Romero
decided to follow the vehicle, run the registration on the
vehicle and take a closer look at the tire and bed of the truck.
(Tr. 40:18-23.)

        After Troopers Romero and Arnold started following the
Silverado, Trooper Romero observed the vehicle's driver, later
identified as Joseph Vigna ("Vigna"), commit three marked lane
violations.  (Tr. 41:6-10.)  Trooper Romero observed the first
violation when the Silverado left its lane and crossed over the
line on its right.  (Tr. 41:24-42:3.)  Then, less than a quarter
mile later, Trooper Romero observed Vigna drive the Silverado
outside of its lane at the same time that Vigna was watching
Trooper Romero through Vigna's side mirror.  (Tr. 42:4-17.)
Trooper Romero observed Vigna commit the third violation when
Vigna caused the Silverado to nearly drive onto the rumble
strip, which was approximately 12 to 18 inches away from the
lane line.  (Tr. 42:18-22; Tr. 49:3-8; Tr. 159:15-160:4; Tr.
214:12-13; Tr. 217:4-14.)  Trooper Romero clearly observed the

- 45 -

marked lane violations because he was in an excellent position
to view the Silverado.  (Tr. 49:3-13.)  Prior to stopping the
Silverado, Trooper Romero also noticed that the wheel well of
the Silverado had been altered and that the bed of the truck was
sitting directly on the bed of the truck.  (Tr. 55:16-24.)

Trooper Romero proceeded to activate his vehicle's
overhead lights, pull the Silverado over, and approach the
Silverado from the passenger side.  (Tr. 43:11-23.)  The driver
produced a California driver's license in the name of "Anthony
Vigna," and a vehicle registration in the name of "Corey Steven
Daiker" of Reno, Nevada.  (Tr. 44:4-25.)  The passenger produced
identification from a third state, Arizona, and Trooper Romero
noticed that the passenger's hands were trembling when he
retrieved his driver license out of his wallet, something that
Trooper Romero found to be unusual for a passenger.  (Tr. 45:8-
23; Tr. 57:22-58:2.)  Neither of the individuals in the vehicle -
Anthony Vigna, the driver, and Steven Curtis, the passener - was
the individual listed on the vehicle's registration.  Trooper
Romero found the diversity of states reflected in the
identification documents and the vehicle registration unusual.
(Tr. 57:11-18.)  Furthermore, Trooper Romero noticed the strong
odor of deodorizers coming from within the vehicle, a GPS
device, and three cellular telephones in plain view.  (Tr. 57:2-

9; Tr. 163:22-164:1.)

Trooper Romero - who had first been certified as a dog

handler in May 2001 - proceeded to execute a dog search of the

vehicle using a dog named "Hans," the dog with whom Trooper

Romero had been certified and whom Trooper Romero first received

on April 1, 2001.  (Tr. 10:20-21; Tr. 12:25-13:6.)  This dog,

Hans, had been trained to detect the odors of controlled

substances and had also been, on eight or ten occasions between

2009 and 2011, placed in the presence of clean currency without

alerting or positively indicating.  (Tr. 99:23-100:4; Tr. 88:19-

89:14; Tr. 12:16-22.)  During this search, Hans had an

aggressive reaction at the passenger door, digging at its seam.

(Tr. 62:9-19.)  Based on his training and experience and his

time handling Hans, Trooper Romero took this behavior to be a

reliable and valid positive indication.  (Tr. 14-20.)

After Vigna and Curtis were removed from the vehicle,

the Silverado was transported to a private garage, "Express

Towing," where Trooper Romero looked for an access point to get

into the secret compartment that Trooper Romero suspected to

exist.  (Tr. 70:5-71:5.)  Not finding the compartment, Trooper

Romero decided to drill into the bottom of the Silverado's truck

bed and, after doing so, found in a compartment fruit saver

packages containing what appeared to be United States currency.

- 47 -

(Tr. 71:5-10.)  After locks were located on the side of the
secret compartment, a mechanic hot-wired the locks to open the
entire compartment.  (Tr. 79:21-25.)  Numerous double and triple
vacuum-sealed packages of U.S. currency were found in the
divided compartment in the bed of the truck and were transported
to the highway patrol post.  (Tr. 79:25-81:1; Tr. 187:25-
188:17.)  At the highway patrol post, the approximately
$1,033,000 in currency was placed on a picnic table and
photographed.  (Tr. 81:1-22.)

**B.  Daiker Lacks Standing to Suppress Evidence From the
Stop and Search of the Silverado**

### 1. Legal Standard

Defendants seeking to invoke the exclusionary rule
must show that the allegedly illegal conduct infringed their
personal constitutional rights.  See United States v. Padilla,
508 U.S. 77, 81 (1993).  Where a Fourth Amendment violation is
claimed, a defendant seeking to have evidence suppressed must
have a reasonable expectation of privacy in the location or
items searched.  See Rakas v. Illinois, 439 U.S. 128, 143
(1978).  The expectation has both subjective and objective
components: a defendant must have a subjective expectation of
privacy, and the expectation must be one that society is
prepared to recognize as reasonable.  See United States v.

Osorio, 949 F.2d 38, 40 (2d Cir. 1991).  A defendant has the
burden of establishing standing.  See Osorio, 949 F.2d at 40.

        The Second Circuit and other Circuit Courts have found
a vehicle owner to have abandoned his reasonable expectation of
privacy in that vehicle while it was lent to a third party.  See
United States v. One 1986 Mercedes Benz, 846 F.2d 2, 4 (2d. Cir
1988) ("We believe that by lending the Mercedes to Chow, Parker
abandoned any legitimate expectation of privacy in the area
searched and thus may not now contest the legality of the
search.") (citation omitted); United States v. One 1977 Mercedes
Benz, 450 SEL, 708 F.2d 444, 449-50 (9th Cir. 1983) ("Under these
circumstances, we hold that Webb relinquished her expectation of
privacy when she lent her automobile to Reese.  She may not now
contest the legality of the seizure of the cocaine from the open
passenger area of her automobile while it was in Reese's
possession."); United States v. Dall, 608 F.2d 910, 915 (1st Cir.
1979) (holding that when the owner of a truck gave possession to
another for the other's uses to the temporary exclusion of the
owner, he extinguished the already diminished expectation of
privacy attached to automobiles); United States v. Dyar, 574
F.2d 1385 (5th Cir. 1978) ("Even if we were to assume that
Streeter and Dyar had a leasehold interest in the searched
aircraft sufficient to create a traditional property right, when

- 49 -

they gave possession to Fleming they abandoned any expectation
of personal privacy in the aircraft.  Streeter and Dyar,
therefore, lacked standing to contest the legality of the
search.") (citation omitted).

### 2. Analysis

Daiker bears the burden of establishing standing to
contest the search.  See Osorio, 949 F.2d at 40.  In an attempt
to meet his burden, Daiker asks the Court to rely entirely on
his ownership of the Silverado (although he has refrained from
submitting an affidavit asserting ownership).  (Defendant
Daiker's Memorandum of Points and Authorities in Support of
Motion to Suppress Evidence (Docket No. 40) ("Daiker Br.") at
3.)  Daiker cites two cases, Dejesus and Sanchez, for the
proposition that ownership is sufficient to establish standing
when it comes to the search of a vehicle, the context at issue
in the instant motion.  Dejesus v. Village of Pelham Manor, 282
F.Supp.2d. 162, 173 (S.D.N.Y. 2003); United States v. Sanchez,
635 F.2d 47, 64 (2d Cir. 1980).  (Id.)  However, these two cases
are readily distinguished.

As an initial matter, neither Dejesus nor Sanchez
involved a claim of standing by a vehicle's owner, the posture
of  Daiker on this motion.  Dejesus, 282 F.Supp.2d. 173 ("none of
the Plaintiffs allege ownership of the vans at issue here");

Sanchez, 635 F.2d at 64 ("In the present case Delgado demonstrated neither ownership of the Pontiac, nor license from the owner to possess the Pontiac. . . The registered owner of the car, Hernan Loiza, did not appear below[.]")  Daiker's total reliance on these two cases is therefore misplaced.

Moreover, in each of these cases, the Court held that the party asserting standing did not have standing to challenge the search at issue.  Dejesus, 282 F.Supp.2d. at 173 ("Because Plaintiffs do not properly provide evidence of standing and an impermissible search with regard to either car, their search and seizure claim as to the vans at issue must be dismissed.");  Sanchez, 635 F.2d at 64 ("The burden was on Delgado to establish his standing to object to the search.  He failed to do so and his motion to suppress Crawford's testimony and the photographs of the wheel wells was properly denied.").

Over and above the fact that Dejesus and Sanchez are inapposite, Daiker asks the Court to accept a proposition that conflicts with the law of the Second Circuit and other Courts of Appeals.  See United States v. One 1986 Mercedes Benz, 846 F.2d 2, 4 (1988) ("We believe that by lending the Mercedes to Chow, Parker abandoned any legitimate expectation of privacy in the area searched and thus may not now contest the legality of the search.");  United States v. Dall, 608 F.2d 910, 915 (1st Cir.

- 51 -

1979) ("The already diminished expectation of privacy that
attaches to motor vehicles is still further attenuated when the
owner had given  over possession to another for the other's own
uses to the temporary exclusion of the owner.")(citations
omitted); see also United States v. One 1977 Mercedes Benz, 450
SEL, 708 F.2d 444, 449-50 (9th Cir. 1983); United States v.
Dyar, 574 F.2d 1385 (5th Cir. 1978).

        Daiker's argument that he has standing to contest the
search of the Silverado is unpersuasive.  First, Daiker has not
asserted any facts to support his theory of standing.  Not only
has he failed to submit an affidavit to set forth a factual
basis for his standing to contest the search, he has made it
clear that  he is not asserting the veracity of any of the facts
he recites in his motion papers.  (Daiker Br. at n.3 ("As
discussed herein, Mr. Daiker does not concede that the following
factual recitation is a true accounting of what transpired.").)
Second, even if Daiker were to  submit an affidavit asserting
that he was the rightful owner of the Silverado and that he had
loaned it to Vigna and Curtis, Daiker would not have standing to
contest the search because he "abandoned any legitimate
expectation of privacy" in the Silverado.  One 1986 Mercedes
Benz, 846 F.2d at 4.  Accordingly, Daiker lacks standing to
challenge Trooper Romero's search of the Silverado.

**C.    In any Event, There is no Material Fact in Dispute Concerning the Legality of the Stop of the Silverado**

Even if Daiker had standing to challenge the search of the Silverado, his motion would appropriately be denied without an evidentiary hearing, because Daiker has not put forward a sworn affidavit generating a material dispute concerning a stop and search that is clearly legal based upon sworn law enforcement testimony.

**1. Relevant Legal Standards**

*a. Vehicle Stop*

In an "investigative detention" or "Terry stop," an officer may detain a suspect for brief questioning without probable cause, as required for a traditional arrest, so long as the officer has "a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity." See Brown v. Texas, 443 U.S. 47, 51 (1979); see also United States v. Brignoni-Ponce, 422 U.S. 873, 881 (1975) ("[I]n appropriate circumstances the Fourth Amendment allows a properly limited 'search' or 'seizure' on facts that do not constitute probable cause to arrest or to search for contraband or evidence of a crime.")  The Fourth Amendment permits an investigative stop of an automobile, if based on reasonable suspicion. See United States v. Elmore, 482 F.3d 172, 178, 183 (2d Cir. 2007) (finding

officers had reasonable suspicion to perform <u>Terry</u> stop of defendant's car).  <u>See also</u> <u>United States</u> v. <u>Gonzalez</u>, 864 F. Supp. 375, 383 (S.D.N.Y. 1994) (discussing rationale for car-stops in the <u>Terry</u> context)(citing <u>United States</u> v. <u>Hensley</u>, 469 U.S. 221, 226 (1985)).

Reasonable suspicion is established when law enforcement officers "are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion . . . ." <u>Brignoni-Ponce</u>, 422 U.S. at 884.  The test for reasonable suspicion is "rather lenient," <u>United States</u> v. <u>Santana</u>, 485 F.2d 365, 368 (2d Cir. 1973), and is "not a difficult one to satisfy." <u>United States</u> v. <u>Oates</u>, 560 F.2d 45, 63 (2d Cir. 1977).  "Like probable cause, reasonable suspicion is determined based on the totality of the circumstances but 'the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." <u>Elmore</u>, 482 F.3d at 179 (quoting <u>United States</u> v. <u>Arvizu</u>, 534 U.S. 266, 273-274 (2002)).  "Some minimal level of objective justification" is required.  <u>Alabama</u> v. <u>White</u>, 496 U.S. 325, 329-330 (1990) (quoting <u>INS</u> v. <u>Delgado</u>, 466 U.S. 210, 217 (1984)).  Moreover, the "totality of the circumstances" approach "allows officers to draw on their own experience and specialized

training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" <u>Arvizu</u>, 534 U.S. at 273 (quoting <u>United States</u> v. <u>Cortez</u>, 449 U.S. 411, 417-418 (1981)).

Even reasonable suspicion of a traffic infraction, which is merely a violation and not a crime, is a sufficient basis for a traffic stop.  <u>See United States</u> v. <u>Stewart</u>, 551 F.3d 187, 193 (2d Cir. 2009)(reversing district court that required more exacting standard).  In the face of the argument that a traffic stop is merely a pretext, the Supreme Court has "been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers." <u>Whren</u> v. <u>United States</u>, 517 U.S. 806, 813 (1996) (upholding stop); <u>see also Devenpeck</u> v. <u>Alford</u>, 543 U.S. 146, 153 (2004) (officer's justification for stopping and arresting defendant "need not be the criminal offense as to which the known facts [objectively] provide probable cause").  The Second Circuit had taken this position even prior to <u>Whren</u>.  <u>See United States</u> v. <u>Scopo</u>, 19 F.3d 777, 784-85 (2d Cir. 1994) (reversing lower court decision suppressing gun recovered as result of pretextual stop); <u>see also United States</u> v. <u>Nersesian</u>, 824 F.2d 1294, 1316 (2d Cir. 1987) (lawful basis to detain and search "not rendered invalid by the fact that police resort to a pretext for one purpose or

another to continue that detention and search"). <u>Dhinsa</u> was

extended in <u>United States</u> v. <u>Harrell</u>, 268 F.3d 141 (2d Cir.

2001), where the Court reversed a suppression order even though

the police officer testified that he did not detect any traffic

violation, because "the historical facts of this case persuade us

that an 'objectively reasonable' police officer would have

suspected the [car] windows were tinted in violation of [New

York law]." <u>Harrell</u>, 268 F.3d at 149.

####     b.  *Vehicle Search*

         If the police have probable cause to believe that a

vehicle contains evidence of a crime, it may be searched without

a warrant.  <u>See</u> <u>Carroll</u> v. <u>United States</u>, 267 U.S. 132 (1925);

<u>Pennsylvania</u> v. <u>Labron</u>, 518 U.S. 938, (1996) ("If a car is

readily mobile and probable cause exists to believe it contains

contraband, the Fourth Amendment ... permits police to search

the vehicle without more."); <u>see</u> <u>also</u> <u>Colorado</u> v. <u>Bannister</u>, 449

U.S. 1, 3 (1980); <u>United States</u> v. <u>Gaskin</u>, 364 F.3d 438, 456 (2d

Cir. 2004) (permitting "a warrantless search of a readily mobile

motor vehicle if probable cause exists to believe the vehicle

contains contraband or other evidence of a crime"); <u>Arizona</u> v.

<u>Gant</u>, 556 U.S. 332, 129 S. Ct. 1710 (2009) (discussed in greater

detail in the section, <u>supra</u>, that discusses the DiBari vehicle

search).   This so-called automobile exception to the warrant
requirement is based on twin rationales: (1) the inherent
mobility of vehicles that often makes obtaining a warrant
impractical; and (2) the "pervasive regulation" of vehicles that
results in a lower expectation of privacy than exists with
respect to a home.  California v. Carney, 471 u.s. 386, 391-94
(1985).  Exigent circumstances are not required to justify the
search because the vehicle's mobility provides "an exigency
sufficient to excuse failure to obtain a search warrant."
Pennsylvania v. Labron, 518 U.S. 938, 940 (1996); see Maryland
v. Dyson, 527 U.S. 465 (1999).  Nor is it relevant that law
enforcement officers had time to procure a warrant to search the
vehicle, given that no warrant is required at all.  See United
States v. Howard, 489 F.3d 484, 495 (2d Cir. 2007) (under
automobile exception "reasonable search does not become
unreasonable" because of lack of warrant); see also United States
v. Vassiliou, 820 F.2d 28, 30 (2d Cir. 1987).

　　　*c.  Evidentiary Hearing*

　　　A defendant does not have an automatic right to a
suppression hearing; instead, he must show "that disputed issues
of material fact exist before an evidentiary hearing is
required."  United States v. Castellano, 610 F. Supp. 1359, 1439
(S.D.N.Y. 1985); see also United States v. Culotta, 413 F.2d

1343, 1345 (2d Cir. 1969) (the defendant must "state sufficient facts which, if proven, would [require] the granting of the relief requested by [him]"); Furthermore, "[i]t is well established that without a supporting affidavit of someone with personal knowledge of the underlying facts, the court need not resolve factual disputes that may be raised by the moving papers." United States v. Richardson, 837 F.Supp. 570, 572 (S.D.N.Y. 1993). "It is well established that in order to challenge a search, a defendant must submit an affidavit from someone with personal knowledge demonstrating sufficient facts to show that he had a legally cognizable privacy interest in the searched premises at the time of the search." United States v. Ruggiero, 824 F. Supp. 379, 391 (S.D.N.Y. 1993) (citing Rawlings v. Kentucky, 448 U.S. 98 (1980); United States v. Salvucci, 448 U.S. 83 (1980); United States v. Paulino, 850 F.2d 93, 96 (2d Cir. 1988); United States v. Arboleda, 633 F.2d 985, 991 (2d Cir. 1980)). In addition, the affidavit must establish a material dispute as to the facts underlying the suppression motion. See United States v. Gilette, 383 F.2d 843, 848 (2d Cir. 1967) (affirming denial of hearing because "there was no factual issue to be resolved" when "affidavit submitted for appellant is insufficient in that it does not, for example, allege personal knowledge on the part of appellant's attorney");

- 58 -

United States v. Caruso, 684 F. Supp. 84, 87 (S.D.N.Y. 1988)
("Without a supporting affidavit of someone with personal
knowledge of the underlying facts, the court need not resolve
factual disputes that may be presented by the moving papers.").

### 2. Analysis

Even if Daiker had standing to challenge the search
of the Silverado, his motion should be denied, because sworn
testimony as to which there is no material factual dispute
establishes that the stop and search comported with the Fourth
Amendment.  The sworn testimony of Trooper Romero establishes
that Trooper Romero had reasonable suspicion to stop the
Silverado.  First, Romero observed the Silverado slow down for
no apparent reason.  Second, Romero clearly observed Vigna
commit three separate marked lane violations as Romero followed
the Silverado, including one occasion during which Vigna nearly
drove the Silverado onto the rumble strip 12 to 18 inches from
his lane.  Mere reasonable suspicion of a single marked lane
violation, let alone three different violations, is a sufficient
basis for a traffic stop.  See Stewart, 551 F.3d at 193.  Third,
prior to stopping the Silverado, State Trooper Romero noticed
that the spare tire mounted on the underside of the Silverado
appeared extremely low, with almost the whole tire visible under
the vehicle, which is much lower than it would be on a normal

- 59 -

truck.  (Tr. 75:11-18.)  Fourth, State Trooper Romero noticed
that the wheel well of the Silverado had been altered.  State
Trooper Romero's observations regarding the wheel well and the
spare tire are clear examples of an experienced law enforcement
officer permissibly drawing on his "own experience and
specialized training to make inferences from and deductions
about the cumulative information" that might "elude an untrained
person."  Arvizu, 534 U.S. at 273.

     The traffic infractions, the altered wheel well and
the abnormally-low spare tire are each -- when considered in
isolation -- sufficient to provide "some minimal level of
objective justification[,]" for the stop, which is what Terry
requires.  Delgado, 466 U.S. at 217.  When considered together,
it is clear that State Trooper Romero had far in excess of the
reasonable suspicion necessary to support his decision to stop
the Silverado.  Elmore, 482 F.3d at 179 ("reasonable suspicion is
determined based on the totality of the circumstances").

     Trooper Romero's sworn testimony also establishes that
he had probable cause to search the Silverado after the stop.
First, the appearance of the Silverado, with its extremely low
spare tire and altered wheel well, strongly suggested that the
Silverado had been altered to store contraband.  Second,
neither the driver nor passenger of the car was the registered

- 60 -

owner of the car.  Third, the driver, the passenger and the

vehicle were each from different states, which Trooper Romero

found to be significant.  Fourth, State Trooper Romero noticed

that Mr. Curtis' hands were trembling when he retrieved his

license from his wallet, which Romero found to be unusual for a

passenger (rather than a driver) during a traffic stop.  Fifth,

State Trooper Romero smelled the strong odor of deodorizers

coming from the car, which, together with evidence of the

alteration of the Silverado, suggests  that the vehicle

contained contraband.  Finally, Romero's trained canine unit, a

dog named "Hans," had an aggressive reaction at the passenger

door, which, based on his years of experience handling Hans,

Romero took to be a reliable and valid positive indication of

contraband.  See United States v. Place, 462 U.S. 696, 707

(1983) (a "canine sniff" is not a search because the procedure is

"so limited both in the manner in which the information is

obtained and in the content of the information").  These six

circumstances, inter alia, clearly provided State Trooper Romero

with probable cause to believe that the Silverado contained

contraband.

Daiker concedes that "a positive indication by a

properly trained dog is likely sufficient to establish probable

cause" but argues that "[t]he government must, however, provide

evidence establishing the reliability of Trooper Romero's K-9,
Hans[.]" (Daiker Br. at 9-10.)  Importantly, during every
certification session that Trooper Romero and Hans undertook
over approximately 10 years for two different certifying
entities, Hans received a perfect score.  (Tr. 15:5-23.)  This
perfect score reflected that Hans located all hidden substances
he was required to find and didn't make false alerts.  (Id.)
Thus, the Government has in fact provided sworn testimony
establishing Hans' reliability and, accordingly, the positive
canine hit is alone sufficient to constitute probable cause to
search the vehicle.  Taking the positive canine hit together
with the numerous other suspicious circumstances Trooper Romero
observed, it is abundantly clear that Trooper Romero had
probable cause to search the Silverado.[9]

　　　　Because Trooper Romero's sworn testimony sets forth

---

[9] Daiker also suggests that the "prolonged detention of Mr.
Daiker's vehicle the extent of transporting it to a separate
location and dismantling it[]" went beyond the time reasonably
required.  (Daiker Br. 10.)  Romero transported the Silverado to
a separate location to conduct the search because Express Towing
had a lift, tools, and mechanics on duty 24 hours a day, all
useful for the search of a vehicle with the hidden compartment
Romero suspected.  (Tr. 70:19-23.)  Another reason for the
duration of the stop was the time it took to count the massive
amount of currency seized in the hidden compartment of the
Silverado.  (Tr. 89:19-90:17.)  Because Vigna claimed the U.S.
currency as his own, the Highway Patrol's protocol required that
the law enforcement agents count the approximate $1,033,000 in
currency twice and give Vigna a receipt.  (Tr. 90:1-14.)

sufficient facts to justify the stop and Daiker has submitted no affidavit sufficient to generate a material dispute as to those facts, "there [is] no factual issue to be resolved" through a hearing, Gilette, 383 F.2d at 848, and the defendant's suppression motion should be denied.

## IV. THE DEFENDANTS' MOTION FOR AN ORDER REQUIRING THE IMMEDIATE DISCLOSURE OF RULE 404(b) EVIDENCE SHOULD BE DENIED

Defendants DiBari and McFarlane move the Court for an order requiring the Government to disclose without delay evidence the Government intends to introduce at trial concerning the defendants' bad acts and to disclose, inter alia, whether such conduct is "presently the subject of a pending charge or ongoing criminal investigation[,]" as well as the "element of the crime for which each such misconduct, crime, or 'bad act' is offered to prove." (Defendant Jason DiBari's Notice of Motion and Motion for Rule 404(b) Evidence Regarding Prior or Subsequent Bad Acts ¶¶ 4, 5 (Docket No. 46); Defendant Roger McFarlane's Notice of Motion and Motion for Rule 404(b) Evidence Regarding Prior or Subsequent Bad Acts ¶¶ 4, 5 (Docket No. 71) (quotations identical in each).) Defendant Daiker seeks to join this motion. For the reasons that follow, this motion should be denied.

Rule 404(b) requires that the Government provide

"reasonable notice in advance of trial, or during trial if the
court excuses pretrial notice on good cause shown" of its intent
to use evidence of other crimes, wrongs, or bad acts.  Fed. R.
Evid. 404(b).  The Rule specifies that the Government need only
provide "the general nature of any such evidence."  Id.   Rule
404(b), however, sets no minimum time for action by the
Government, nor would any time limit be appropriate, because the
evidence the Government wishes to offer may change as the proof
and potential defenses crystallize.  See United States v.
Allums, 97 Cr. 267(HS), 1997 WL 599562, *1 (S.D.N.Y. Sept. 25,
1997) ("The Government has agreed to produce this material in
time so that the defense may have an opportunity to challenge
their admission; this is all that is required with respect to
Rule 404(b) evidence.") (Baer, J.); United States v. Matos-
Peralta, 691 F. Supp. 780, 790 (S.D.N.Y. 1988).

        The Government has not yet determined what 404(b)
evidence it may seek to introduce at trial.  The Government will
disclose the substance of prior bad acts, however, in a timely
fashion in order to permit the defendants an opportunity to
challenge admission and to permit the Court to make an
appropriate finding.  See Fed. R. Evid. 404(b); United States v.
Perez, 940 F. Supp. 540, 553 (S.D.N.Y. 1996).  Moreover, the
Government's notice will be sufficient to apprise the defendant

of the "general nature" of the prior bad acts as the rule requires. Accordingly, the defendant's instant motion for immediate Rule 404(b) notice should be denied.

## V.   THE DEFENDANTS' MOTIONS FOR DISCLOSURE OF WITNESS'S IDENTITIES, PRIOR STATEMENTS, AND IMPEACHMENT MATERIAL SHOULD BE DENIED

The defendants' motions for pretrial disclosure of the identity of the Government's witnesses, their prior statements, and impeachment material should be denied.  These requests seek an order that is barred by statute, in the case of prior witness statements, and is both premature and inappropriate absent a particularized showing of need, in the case of the request for a witness list.

### A.  Witness List

Several defendants request that they receive a witness list to enable them to prepare for trial but do not establish the particularized need for early disclosure of a witness list necessary in order for the disclosure of witness identities to be warranted.

There is no rule requiring pretrial disclosure of Government witnesses.  As the Second Circuit has explained, "Federal Rule of Criminal Procedure 16 does not require the Government to furnish the names and addresses of its witnesses." United States v. Bejasa, 904 F.2d 137, 139 (2d Cir. 1990).  Nor

does any other rule or statute obligate the Government to disclose the identity of its prospective witnesses.  See United States v. Gasparik, 141 F. Supp. 2d 361 (S.D.N.Y. 2001) ("It is well settled that a defendant has no general right to pretrial disclosure of the Government's witnesses."); United States v. Alessi, 638 F.2d 466, 481 (2d Cir. 1980) ("[T]he prosecution [is] under no obligation to give [the defendant] advance warning of the witnesses who would testify against him . . . ") (citing Weatherford v. Bursey, 429 U.S. 545, 559 (1971)).

        While the Second Circuit has held that district courts have inherent authority to compel pretrial disclosure of the identity of Government witnesses, it has made clear that such orders are appropriate only under limited circumstances.  United States v. Cannone, 528 F.2d 296, 301 (2d Cir. 1975).  In evaluating a defendant's request for the identity of Government witnesses, the Second Circuit has instructed that courts should balance the possible dangers of disclosure (such as subornation of perjury, witness intimidation, and injury to witnesses) with the defendant's specific need for the information.  Id.  A defendant is entitled to disclosure of the Government's witnesses only if he makes "a specific showing that the disclosure [is] both material to the preparation of his defense and reasonable in light of the circumstances surrounding his

case." Id. (citation omitted).  A mere "abstract conclusory claim that such disclosure [is] necessary to [the] proper preparation for trial" is insufficient.  Cannone, 528 F.2d at 301-02 (holding it was an abuse of discretion for the district court to grant a defense motion for a witness list).  See United States v. Biaggi, 675 F. Supp. 790, 810-11 (S.D.N.Y. 1987) (holding that a court may order disclosure after balancing the defendant's need for disclosure and the Government's need for concealment, but the defendant must make a specific showing of need; denying request for witness list). Absent a "particularized showing of need," the defendant is not entitled to lists of government witnesses.  United States v. Feola, 651 F. Supp. 1068, 1138 (S.D.N.Y. 1987) (noting courts in this district have "widely found that the defendant is not entitled to a witness list absent a particularized showing of need"); United States v. Wilson, 565 F. Supp. 1416, 1438 (S.D.N.Y. 1983) (overruled on other grounds, United States v. Reed, 773 F. 2d 477 (2d Cir. 1985)) (same).

        Moreover, a defendant's request for a witness list must be weighed against the government's "strong interest in nondisclosure" in light of concerns about the dangers of witness tampering and intimidation. United States v. Alvalle, No. 85 Cr. 419 (JFK), 1985 WL 2348, at *1 (S.D.N.Y. Aug. 22, 1985). See

also <u>United States</u> v. <u>Ahmad</u>, 992 F. Supp. 682, 685 (S.D.N.Y. 1998) (denying motion for the identities of confidential informants).  These concerns are particularly weighty in drug cases.  <u>See</u> <u>United States</u> v. <u>Feola</u>, 651 F. Supp. 1068, 1147 (S.D.N.Y. 1987) (denying disclosure of witness identities because disclosure "is not required for the preparation of the defense, particularly when balanced against the potential danger to these witnesses in a narcotics case such as this"); <u>United States</u> v. <u>Nachamie</u>, 91 F. Supp. 2d 565, 572-573 (S.D.N.Y. 2000) (ordering disclosure of co-conspirator information in fraud case, but distinguishing fraud from "cases concerning narcotics trafficking," in which protecting names of unindicted coconspirators would be a "legitimate concern").  Because the defendants cannot make the particularized showing of need necessary to justify pretrial disclosure of a witness list, particularly in light of the risks inherent in disclosing such a list in a drug trafficking case, the defendant's motion seeking a witness list should be denied.

   **B.   Identities of Witnesses**

        With regard to the defendants' request for the identities of cooperating witnesses, the "general and well-established rule is that the Government enjoys a 'privilege to withhold from disclosure the identity of persons who furnish

- 68 -

information of violations of law to officers charged with
enforcement of that law.'" United States v. Shamsideen, No. 03
Cr. 1313 (SCR), 2004 WL 1179305, at *11 (S.D.N.Y. March 31,
2004) (citing Roviaro v. United States, 353 U.S. 53, 59 (1957),
and United States v. Jackson, 345 F.3d 59, 69 (2d Cir. 2003)).
An exception to this general rule exists only in the unusual
case in which "the defendant shows that discovery of the
witness's identity is material to the defense." United States
v. Robles, No. 04 Cr. 1036 (GEL), 2005 WL 957338, at *1
(S.D.N.Y. Apr. 22, 2005) (citing United States v. Saa, 859 F.2d
1067, 1073 (2d Cir. 1988)).

        The defendant bears the burden of demonstrating that
he is entitled to the "extraordinary remedy" of disclosure.
United States v. Muyet, 945 F. Supp. 586, 602 (S.D.N.Y. 1996).
It is not enough for a defendant simply to show that the
informant was a participant in and witness to the crime charged.
Saa, 859 F.2d at 1073 (citing United States v. Jiminez, 789 F.2d
167, 170 (2d Cir. 1986)); United States v. Morales, 280 F. Supp.
2d at 271 ("[E]ven participation of the confidential informant
in the conspiracy alleged against the defendant is insufficient
on its own to warrant disclosure."). Nor can a defendant meet
his burden by speculating on the Government's case against the
defendant, or the informant's role therein. United States v.

- 69 -

Fields, 113 F.3d at 324 ("Speculation that disclosure of the informant's identity will be of assistance is not sufficient to meet the defendant's burden."). Rather, the defendant must make an affirmative showing that "the disclosure of an informant's identity . . . is relevant and helpful to the defense of an accused, or is essential to the fair determination of a cause," Saa, 859 F.2d at 1067, and that, accordingly, the need for disclosure of an informant's identity outweighs the Government's interest in anonymity. Shamsideen, 2004 WL 1179305, at *11.

The defendants' generalized request falls far short of justifying the "extraordinary remedy" of disclosure. Muyet, 945 F. Supp. at 602. Nor does the fact that, as DiBari argues, certain witnesses "were participants and percipient witnesses to the charged allegations" require disclosure as the law is clear that participation in the conspiracy is insufficient to require disclosure. Morales, 280 F. Supp. 2d at 271. Accordingly, the defendants have not met the substantial burden of rebutting the presumption of nondisclosure of any witness' identity.

C.  **Prior Statements of Witnesses**

Finally, the defendants' requests for early production of the prior statements of witnesses should be denied, because the Court is without authority to order such disclosure prior to trial. The law is clear that the Government is under no

- 70 -

obligation under the Jencks Act, 18 U.S.C. § 3500 et seq., to produce prior statements of its witnesses until after each has testified on direct examination.  The Jencks Act provides in pertinent part:

> In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

18 U.S.C. § 3500.

Courts in this Circuit have consistently held that the district court lacks the power to mandate early production of Jencks material.  See, e.g., United States ex rel. Lucas v. Regan, 503 F.2d 1, 3 n.1 (2d Cir. 1974); In re United States, 834 F.2d at 287; United States v. Ortiz-Montoya, No. 93 Cr. 0050 (RWS), 1995 WL 37841, at *1 (S.D.N.Y. Jan. 31, 1995); United States v. McGuinness, 764 F. Supp. 888, 896 (S.D.N.Y. 1991). In United States v. Coppa, 267 F.3d 132 (2d Cir. 2001), the Second Circuit held that the "Jencks Act prohibits a District Court from ordering the pretrial disclosure of witness statements," id. at 145, and granted mandamus to vacate a district court's scheduling order requiring earlier disclosure, id. at 146.

With respect to the timing of disclosing material

- 71 -

under Giglio, the Second Circuit, in United States v. Coppa, rejected the argument that such material should be disclosed when defendants make a demand for it.  267 F.3d 132 (2d Cir. 2001).  The Court held that as a general rule, Brady and its progeny do not require immediate disclosure of all exculpatory and impeachment material upon request of a defendant.  Id. at 146.  It found that the time required for its effective use would depend on the materiality of the evidence as well as the particular circumstances of the case, and suggested that district courts may order disclosure of material it deems material as a matter of case management.  Id. at 146.

Under the circumstances of this case, there is no need for early disclosure of impeachment material under Giglio.  The Government does not intend at this time to call any witnesses who require the disclosure of voluminous impeachment materials. The provision of the impeachment material on the Friday before the first day of trial will allow defense counsel adequate time to prepare for cross-examination of Government witnesses as they come up at trial.  See, e.g., United States v. Trippe, 171 F. Supp. 2d 230, 237 (S.D.N.Y. 2001) ("The usual practice in this district is that the Government agrees to make impeachment information available to the defense at the same time as Jencks Act material, that is, at least one day before the Government

- 72 -

witness is called to testify"); <u>United States</u> v. <u>Rueb</u>, 00 Cr. 91, 2001 WL 96177(RWS), at *6-7 (S.D.N.Y. Feb. 5, 2001) (Government directed to provide <u>Giglio</u> material at least one day before calling the relevant witness to testify).

In accordance with common practice in this district, the Government will provide the defense with all impeachment material that must be produced under <u>Giglio</u> v. <u>United States</u>, 405 U.S. 150 (1972), and Jencks Act materials under 18 U.S.C. § 3500 on the Friday prior to the start of the trial. The defendant's request for early disclosure of such material should be denied.

**VI.  <u>THE DEFENDANTS' MOTIONS ASKING THAT THE COURT COMPEL DISCOVERY OF BRADY MATERIAL AND THE PRESERVATION OF AGENTS' ROUGH NOTES SHOULD BE DENIED</u>**

Several defendants have filed motions seeking orders to compel the Government to comply with obligations that the Government does not dispute. DiBari and Green seek an order to compel the preservation of law enforcement agents' and other Government notes. (<u>See</u> Memorandum of Points and Authorities in Support of Jason DiBari's Motion to Preserve Rough Notes and Produce Unredacted Reports (Docket No. 59); Memorandum of Law in Support of Thomas Green's Pretrial Motions (Docket No. 36) at 7.) DiBari also requests that the Court order disclosure of certain <u>Brady</u> material. (Memorandum of Points and Authorities

- 73 -

in Support of Jason DiBari's Motion to Preserve Rough Notes and
Produce Unredacted Reports (Docket No. 59) at 3.)

Such orders are unnecessary.  As the Government
advised counsel for DiBari, it is the practice in this district
to maintain such rough notes and to turn them over, when
appropriate, as 3500 material.  Moreover, the Government
recognizes its obligations under Brady v. Maryland, 373 U.S. 83
(1963) and has acknowledged its Brady obligations in
correspondence with defense counsel.  Should the Government
become aware of Brady material, it will promptly produce it.  As
a result, the defendant's request for Brady material should be
denied.  See, e.g., United States v. Gallo, No. 98 Cr. 338
(JGK), 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11, 1999) (denying
defendant's motion to compel production of Brady material based
on Government's representations that "it is aware of its
obligations under Brady . . . and will produce any Brady
material to the defense well before trial"); United States v.
Yu, No. 97 Cr. 102 (SJ), 1998 WL 57079, at *4-5 (E.D.N.Y. Feb.
5, 1998) (denying defense request that Government provide early
disclosure of Brady material because Government acknowledged its
continuing obligation to provide exculpatory material upon its
discovery and assured that it would comply with that
obligation); United States v. Perez, 940 F. Supp. 540, 553

- 74 -

(S.D.N.Y. 1996) (same).

## VII. THE COURT SHOULD DENY THE MOTIONS ASKING THAT THE COURT COMPEL THE GOVERNMENT TO PROVIDE NOTICE OF ITS INTENTION TO USE EVIDENCE AT TRIAL

DiBari and McFarlane both move for an order to compel the Government to provide notice of its intention to use at trial any evidence which the defense may be entitled to discover under Federal Rule of Criminal Procedure 16.  Daiker seeks to join in these motions.

The motions should be denied because through extensive Rule 16 disclosures, the Government has provided the defendant with evidence that it advises the defendant it intends to introduce at trial, and because the Government is not required to submit a narrower exhibit list at this time.  See United States v. Valerio, 737 F. Supp. 844, 847 (S.D.N.Y. 1990) (denying request for list of exhibits as beyond the scope of Rule 16); United States v. Gullo, 672 F. Supp. 99 (W.D.N.Y. 1987) (denying motion under Rule 12(d) for order compelling notice of intention to use evidence at trial when prosecution stated that all items provided in Rule 16 disclosures were for use by Government at trial).

The Government has, in good faith, timely disclosed documents and physical evidence, all of which it advises the

- 75 -

defendants that it intends to use at trial, and will continue to make available to defense counsel any evidence that is obtained during the course of its investigation and which the Government intends to use at trial.  Accordingly, the defendants' motion for additional notice of Rule 16 evidence should be denied.

## VIII. GREEN'S MOTION FOR AN ORDER REQUIRING DISCLOSURE OF ALL DOCUMENTS RELATED TO THE DENIAL OF A REQUEST FOR A SEARCH WARRANT FOR HIS RESIDENCE SHOULD BE DENIED

Defendant Thomas Green, Jr., seeks an order compelling the Government to provide to the defendant "all documents related to the denial of a request for a search warrant for his residence." (Green Disclosure Mot. at 1 (Docket No. 31).)  As set forth below, that motion should be denied, because the Government documents sought by the defendant are not subject to Rule 16 discovery.

### A.  Background

On August 3, 2011, Thomas Green, Jr., was arrested on charges that he participated in a conspiracy to distribute 1,000 kilograms and more of marijuana.  On the date of the arrest, agents went to Green's home, where a woman advised that Green lived there but was not home and permitted the agents to come inside.  (8/3/11 Tr. 8-9.[10])  Agents conducted a security sweep.

---

[10]  Transcripts of the bail hearings for Green are Exhibits A and B to Green's November 29 disclosure motion.  Green's

In the bedroom of Green's home, agents detected a strong odor of marijuana, and observed, under the bed, heat-sealing equipment commonly used to package the illegal drugs for distribution. (Id.)  The woman at the home — believed to be Green's girlfriend — declined to consent to a search beyond the security sweep that the agents had conducted.

One group of agents remained to secure that location in the event that a search warrant was obtained for the illegal drugs that they believed to be on the premises, while others went to a different location where they apprehended the defendant.  When asked, the defendant declined to give his consent to a search of the home. (Id.)

Several agents transported the defendant to the Southern District of New York for presentment, while another agent began working with a prosecutor on an affidavit in support of a search warrant for Green's residence. The affidavit was subsequently presented to a magistrate in the Eastern District of New York. The magistrate judge in the Eastern District of New York ultimately declined to grant the warrant. (8/8/11 Tr. 15-16.)

Meanwhile, at a hearing in the Southern District of

_____

November 29 motion is referred to herein as "Green Disclosure Mot."

New York on the same day, Magistrate Judge Henry B. Pitman
ordered the defendant detained pending trial. In seeking
detention, the Government noted the presumption in favor of
detention; a substantial risk that the defendant would seek to
threaten or harm a cooperating witness in light of his
involvement in prior acts of intimidation; the defendant's three
recent arrests, including for charges of disobeying a court
order; and the evidence — based on the odor of marijuana at the
defendant's home and the heat-sealing equipment that the agents
had observed — that the defendant was continuing to sell
marijuana while he had a pending state criminal case. (8/3/11
Tr. 6-9; see also Compl. ¶¶ 10-11 (discussing threatening
conduct).)  When asked if any marijuana had been seized from the
defendant's home, the Government stated: "Mr. Green declined to
give consent to a search, and I think we're continuing to
resolve whether, with [the] Eastern District, which is where
this residence is located, what recourse we have at this point,
but we don't know whether there's, we don't know what the [odor]
comes from. I think there's reason to believe it comes from
marijuana." (8/3/11 Tr. 9.) In ordering detention, Judge Pitman
cited the presumption for a (b)(1)(A)-level narcotics offense
that no set of conditions could assure the safety of the
community; the evidence provided by the heat-sealing equipment

- 78 -

and odor that the defendant was continuing to deal marijuana;
and the evidence that the defendant had been involved in threats
to a co-conspirator. (Id. at 18-19.)

       Five days later, the defendant appealed Judge Pitman's
order of detention to Part I.  Defense counsel put forward
additional proposed sureties and bail conditions; indicated that
other witnesses disputed there had been a marijuana odor in the
home; argued that agents could have been mistaken about seeing
heat-sealing equipment; and noted that while agents had waited
at Green's home with his wife all day on the date of Green's
arrest, ultimately no search warrant was forthcoming.  (8/8/11
Tr. 5.)  Judge Swain questioned counsel about what the agents
had seen and smelled, and inquired as to whether a search
warrant application had been submitted for the residence.  (Id.
at 14-15.)  The Government advised Judge Swain that a warrant
affidavit had been submitted to magistrate judge on Long Island,
who had found the evidence inadequate to justify a search, and
"indicated that without the agents having seen - having done
surveillance and seen drug activity at the house, that he was
not inclined to grant the warrant. (Id. at 15.)  Judge Swain
then turned to the charges against the defendant, questioning a
Government attorney about the strength of the evidence and about
the sufficiency of the defendant's proposed bail package.  After

these colloquys, Judge Swain denied the defendant's bail application, singling out the allegations concerning the threat to the person who is now a cooperating witness and the representations concerning the strength of the Government's case as factors underlying its determination that the presumption in favor of detention had not been overcome. (Id. at 21-22.)

B.      **Discussion**

The Court should deny the Green's request for an order compelling the Government to disclose "any and all documents related to the failed search of Green's residence on the date of his arrest," because the relevant agent reports and the draft affidavit prepared in support of a search of that location are protected by the Jencks Act and not subject to disclosure under Rule 16.  Under the Jencks Act, statements of Government witnesses — such as the law enforcement agents involved in Green's arrest — shall not "be the subject of ... discovery or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500; see also Fed. R. Crim. P. 16(a)(2).  While Rule 16 authorizes disclosure of documents within the Government's possession, custody, or control if they are "material to preparing the defense," case law makes clear this provision does not permit end-runs around the Jencks Act by compelling broad disclosure of

80

law enforcement reports.

First, as Green's memorandum notes (Green Disclosure Mot. at 5), in order to obtain documents under the "material to preparing the defense" provision in Rule 16, a defendant must make a prima facie showing of "some indication that the pretrial disclosure of the disputed evidence would ... enable [] the defendant significantly to alter the quantum of proof in his favor." United States v. Maniktala, 934 F.2d 25, 28 (2d Cir. 1991) (quoting United States v. Ross, 511 F.2d 757, 762-63 (5th Cir. 1975)); see also United States v. Stein, 488 F. Supp. 2d 350, 357 (S.D.N.Y. 2007). Second, as the Supreme Court has made clear, the evidence in question must be material to a trial defense, not to ancillary legal issues. See United States v. Armstrong, 517 U.S. 456 (1996). Armstrong held that a predecessor version of Rule 16, which provided for discovery of documents "material to the preparation of the defendant's defense," required production of items material "only to defenses in response to the Government's case in chief." Id. at 462. Thus, Rule 16 could not be invoked to require discovery relevant to a selective-prosecution claim, even if the selective-prosecution claim would be fatal to a criminal prosecution. Id.; see also United States v. Ghailani, 687 F. Supp. 2d 365, 368 n.9 (S.D.N.Y. 2010) (noting Rule 16 may be

81

"completely unavailable to compel production of evidence pertinent to an affirmative defense unrelated to the merits of the prosecution's case-in-chief" and that Armstrong "seemed so to indicate").

While Green observes that the "desired documents are directly related to the issues in this case" (Green Disclosure Mot. at 7), Green falls far short of making the stringent materiality showing that Maniktala and other cases require. While Green speculates that documents relating to the search of his residence "could be used to counter the government's case or bolster a defense," and would "aid in witness preparation, corroborate testimony, or assist impeachment or rebuttal" (Green Disclosure Mot. at 7-8), these general arguments could be deployed to seek pretrial disclosure of virtually any government witness in any case.  These arguments do not constitute a showing that the documents sought would "enable [] the defendant significantly to alter the quantum of proof in his favor." Maniktala, 934 F.2d at 28.

The most specific basis that Green proffers for seeking the documents relating to the search of his residence is that the documents would assist in a bail application by enabling Green to argue that facts proffered by the Government in support of detention "were specifically rejected and viewed

82

as not sufficient to establish that Green was dealing with
marijuana at the time of his arrest." (Green Disclosure Mot. at
10.)  This argument makes little sense on its own terms, because
the Government has advised the defendant and the Court, on the
record, of the very fact that the defendant purports to hope the
documents would establish.  (8/8/11 Tr. 15 (noting judge had
"indicated that without the agents having seen - having done
surveillance and seen drug activity at the house, that he was
not inclined to grant the warrant")).  Green can hardly contend
that broad disclosures of Government documents are required so
that he can argue a factual proposition that the Government has
already conceded.  In any event, even if the documents Green
seeks were material to a potential future bail application, the
documents would not be subject to discovery, because Armstrong
establishes that Rule 16's materiality disclosure provision
pertains "only to defenses in response to the Government's case
in chief," 517 U.S. at 462, and not to other defense legal
claims.[11]

_____

[11]   Green offers no authority, moreover, supporting his
claim that search warrants are discoverable even when they are
not executed. While there is no doubt that search warrant
affidavits are generally discoverable, generally such warrants
must be disclosed because they led to the recovery of evidence
and must be released to enable defendants to challenge their
legal sufficiency in suppression motions. The only case the
Government has identified addressing disclosure of search
warrant affidavits in the absence of possible suppression

Finally, Green's suggestion that disclosure is warranted "to correct the misleading statements made by the government on the record during the previous two bail applications" is itself misleading and contrary to the record. As the transcripts of Green's bail hearings make clear, at no time did the Government misinform the Court or defense counsel concerning the Government's activities at the Green residence. At each of the hearings, the Government relied on what agents reported they had seen and smelled at the Green residence in seeking detention.  When questioned regarding Government efforts to enter the residence, the Government's responses were truthful and accurate. In particular, the Government accurately advised the Court on the date of the defendant's arrest that the Government was "continuing to resolve ... what recourse we have at this point" after consent to search the home was declined. (8/3/11 Tr. 9.)  The next week, when the Part I judge inquired as to whether a warrant had been sought for the Green residence,

---

motions concluded that Rule 16 did not require disclosure. See United States v. Parks, 2009 WL 1617010, *5 (E.D. Tenn. 2009). The cases cited by Green, in contrast, not only do not address un-executed warrants but mention search warrants only in passing dicta, United States v. Chimera, 201 F.R.D. 72, 76 (W.D.N.Y. 2001) (rejecting Rule 16 discovery requests of defendant who sought progress reports, minimization instructions, and other documents connected to wire interceptions), or not at all, see United States v. Feola, 651 F. Supp. 1068, 1144 (S.D.N.Y. 1989) (ordering discovery of fingerprint evidence, drug evidence, and telephone logs).

84

the Government advised that an application had been presented to
a magistrate judge in the Eastern District, who had declined to
grant a warrant based on the facts presented. (8/8/11 Tr. 15.)
Defense counsel's suggestion that the Government did not
"voluntarily" provide that fact to the Part I judge is specious,
because, among other things, defense counsel had already made
clear to the district court before the Government spoke at the
Part I proceeding that a search warrant for Green's home had not
been issued. (Id. at 5.)   Indeed, the defendant's arguments that
the Government made misleading representations concerning the
search warrant strikes a particularly false note because the
Government both advised defense counsel of the warrant's denial
on the record at the bail proceeding and freely discussed it in
subsequent conversations.   Because Rule 16 does not support the
pretrial disclosure of the reports and documents that Green
seeks, Green's disclosure motion should be denied.

## IX. THE DEFENDANTS SHOULD BE REQUIRED TO SHOW GOOD CAUSE FOR FILING ANY ADDITIONAL MOTIONS

Multiple of the defendants have requested leave to
file additional motions.   Because the deadline for the filing of
motions has passed, the Government respectfully requests that
the defense be allowed to file additional motions only upon a
showing of good cause.   Rule 12(c) of the Federal Rules of

Criminal Procedure authorizes a district court to "set a deadline for the parties to make pretrial motions." See United States v. Howard, 998 F.2d 42, 52 (2d Cir. 1993).  In the normal course, a party waives his or her right to file pre-trial motions after the deadline for filing motions has passed.  Id.; see also Fed R. Crim. P. 12(e) ("A party waives any Rule 12(b)(3) defense, objection, or request not raised by the deadline the court sets under Rule 12(c) or by any extension the court provides.  For good cause, the court may grant relief from the waiver.").

A district court may grant relief from the waiver upon a showing of "(1) cause for the defendant's non-compliance, and (2) actual prejudice arising from the waiver."  Howard, 998 F.2d at 52; see also United States v. Soto-Teran, 44 F. Supp. 2d 185 (E.D.N.Y. 1996).  A strategic decision by counsel not to pursue a claim, inadvertence of one's attorney, and an attorney's failure to timely consult with his client are all insufficient to establish "good cause."  See United States v. Yousef, 327 F.3d 56, 125 (2d Cir. 2003); United States v. Forrester, 60 F.3d 52, 59 (2d Cir. 1995) (holding that counsel's inadvertence does not establish cause); United States v. Wilson, 11 F.3d 346, 353 (2d Cir. 1993) (holding that the failure to make a suppression motion prior to the deadline set by the trial court constituted

a complete waiver where there is no "reasonable excuse");
Howard, 998 F.2d at 52 (holding that an attorney's failure to
consult his client in timely manner was insufficient to show
cause).

The Indictment in this case was returned on August 18,
2011.  The defendants and their attorneys have had ample time to
consider whether motions should be filed in this case and to
draft and file those motions.  Any further defense motions
should be permitted only upon a showing of good cause

## CONCLUSION

For the foregoing reasons, the Government consents to
a limited evidentiary hearing concerning Jason DiBari's motion
to suppress and respectfully submits that the Court should deny
all other defense motions as meritless.

Dated:    New York, New York
          December 29, 2011

                    Respectfully submitted,

                    PREET BHARARA
                    United States Attorney for the
                    Southern District of New York

          By:    ___/s/ (Jonathan Cohen)_____  ____
                 Janis Echenberg/Rachel Kovner/Jonathan Cohen
                 Assistant United States Attorneys
                 (212) 637-2597/2470/2408

**Certificate of Service**

The undersigned attorney hereby certifies that on the below date, he served or caused to be served the following document in the manner indicated:

**Memorandum of Law of the United States of America in Opposition to Defendants' Pretrial Motions**

Service via ECF filing upon the following attorneys, who are Filing Users in this case:

    Steven E. Savage, Esq.
    Counsel for Roger McFarlane

    James A. Bustamente, Esq.
    Counsel for Jason DiBari

    Zenia K. Gilg, Esq.
    Counsel for Corey Daiker

    Charles C. Russo, Esq.
    Counsel for Richard Cunnius

    Joseph DiBenedetto, Esq.
    Counsel for Thomas Green, Jr.


Dated:  New York, New York
        December 29, 2011


                    PREET BHARARA
                    United States Attorney for the
                    Southern District of New York

                    By:_____/s/ (Jonathan Cohen)_____
                    Jonathan Cohen
                    Assistant United States Attorney
                    Tel.: (212) 637-2408